**18SL-CC01587**

Electronically Filed - St Louis County - April 17, 2018 - 04:00 PM

IN THE CIRCUIT COURT OF THE COUNTY OF ST. LOUIS
STATE OF MISSOURI

| | | |
|---|---|---|
| CHRISTINE GREEN and JORDAN PITLER, on behalf of themselves and all others similarly situated, | ) ) ) | |
| Plaintiffs, | ) ) | Cause No. |
| v. | ) ) | |
| ALCON LABORATORIES, INC.; ALCON RESEARCH, LTD.; ALLERGAN, INC.; ALLERGAN USA, INC.; AND ALLERGAN SALES, LLC. | ) ) ) ) ) | Division No. |
| Defendants. | ) | |

**PLAINTIFFS' CLASS ACTION PETITION**

Electronically Filed - St Louis County - April 17, 2018 - 04:00 PM

## TABLE OF CONTENTS

INTRODUCTION ................................................................................. 1

THE PARTIES ..................................................................................... 6

    Plaintiffs ....................................................................................... 6

    The Alcon Defendants .................................................................. 6

    The Allergan Defendants ............................................................. 7

JURISDICTION AND VENUE ........................................................... 7

FACTUAL ALLEGATIONS REGARDING DEFENDANTS' LIABILITY ............................ 7

    The Amount of Medication That the Eye Can Absorb Is Limited by the Eye's Capacity . 8

    Equivalence of Effectiveness of Larger and Smaller Eye Drops ..................................... 10

    Larger Eye Drops Present a Greater Risk of Systemic Side Effects Compared to Smaller Drops ..................................................................................... 13

    The Scientific Literature States That Drops Should Be No Larger Than 15 µL ............. 16

    Defendants' Eye Drops Are Much Larger Than 15 µL ................................................ 19

    Large Eye Drops Cause Substantial Injuries to Consumers .......................................... 23

    Consumers Could Not Reasonably Have Avoided This Injury ...................................... 37

    There Are No Countervailing Benefits from Eye Drops that Are Larger than the Capacity of the Eye .................................................................................. 38

    The Sizes of Defendants' Eye Drops Are Within Their Control ..................................... 39

    Other Factors that Might Influence the Size of Eye Drops Do Not Prevent Defendants from Reducing the Sizes of their Eye Drops ............................................... 41

    The FDA Does Not Prevent Defendants from Changing the Size of Eye Drops ............ 44

CLASS ACTION ALLEGATIONS ..................................................... 47

DEFENDANTS' ACTIONS ARE UNFAIR UNDER THE FTC'S INTERPRETATION OF SECTION 5(a) OF THE FTC ACT ............................................... 51

VIOLATION OF THE MMPA ............................................................ 54

COUNT I: ALCON'S VIOLATIONS OF MMPA ............................ 56

Electronically Filed - St Louis County - April 17, 2018 - 04:00 PM

COUNT II:  ALLERGAN'S VIOLATIONS OF THE MMPA.................................................... 57

PRAYER FOR RELIEF ................................................................................................... 58

Electronically Filed - St Louis County - April 17, 2018 - 04:00 PM

PLAINTIFFS CHRISTINE GREEN and JORDAN PITLER ("Plaintiffs"), on behalf of themselves and all others similarly situated, file this petition against Defendants Alcon Laboratories, Inc.; Alcon Research, Ltd.;[1] Allergan, Inc.; Allergan USA, Inc.; and Allergan Sales, LLC.;[2] as follows based on personal knowledge as to their own actions and on information and belief as to Defendants' conduct and practices.

## INTRODUCTION

1.      Plaintiffs bring this class action individually and on behalf of Classes of persons and entities (referred to herein collectively as "Class Members," or "Classes") who or which have paid all or part of the purchase prices of prescription eye drops manufactured and sold by Defendants and who or which were compelled by Defendants' unfair and illegal practices to pay for much more medication than the users of those medications needed.

2.      Prescription eye drops, also known as "topical ophthalmic pharmaceuticals," constitute a multi-billion dollar industry in the United States.  Millions of Americans, including Plaintiffs and many other consumers, take these expensive medications pursuant to doctors' prescriptions for serious diseases and conditions such as glaucoma, allergies, infections, inflammations, pre- and post-operative conditions, and others.

3.      These patients are entitled to receive the full use and therapeutic benefit of the entire product they purchase.  Yet because of the Defendants' illegal schemes to increase their profits at consumers' expense, patients are compelled to purchase larger quantities that, through no fault of their own, go to waste, and as a result they and their third-party payors pay much more than they should for the treatment they need.

---

[1] Alcon Laboratories, Inc., and Alcon Research, Ltd., are collectively referred to herein as "Alcon."

[2] Allergan, Inc.; Allergan USA, Inc.; and Allergan Sales, LLC. are collectively referred to herein as "Allergan."

Electronically Filed - St Louis County - April 17, 2018 - 04:00 PM

4.      Defendants sell their prescription eye drop products as fluid in plastic bottles. They sell a given volume of medication (*e.g.*, 2.5 or 5.0 mL) for a certain price, without stating how many doses are contained in the bottles or how many days they will last.

5.      A wealth of scientific literature spanning the past several decades establishes that these bottles, which also serve as dispensers, emit drops so large that they exceed the capacity of the fornix, the area between the eye and the lower eyelid.  As a result, and as that literature likewise shows, much or most of the medication runs down the patient's cheeks, where it can cause allergy or pigmentation, or drains into their nasolacrimal drainage systems and from there into the bloodstream where it can create a risk of toxic side effects.  By Defendants' design, the excess product cannot be used, is entirely wasted, provides no pharmaceutical benefit, and is often harmful.

6.      Much of the literature that forms the basis of this lawsuit was published or supported by these Defendants.  For example, 20 years ago, scientists from Defendant Alcon Laboratories, Inc., joined with scientists from Johns Hopkins School of Medicine in a double-blind study using dropper tips that emitted drops of only 16 µL (microliters, or a millionth of a liter).  They found those drops to have the same therapeutic benefit as 30 µL drops but were better tolerated, and they published the results in a peer-reviewed paper in the American Journal of Ophthalmology.[3]  Yet Alcon has never sold prescription eye drops that are as small as 16 µL. In fact, following publication of this study, Alcon executives, including the company's CEO, told the article's senior author, Dr. Alan Robin, that Alcon would not reduce the drop size of its

---

[3] Mark J. Vocci *et al.*, *Reformulation and Drop Size of Apraclonidine Hydrochloride*, 113 Am. J. Ophthalmology 154, 160 (1992).

products because it would mean that patients would be able to use the bottles longer and Alcon would therefore sell less product and make less money.

7.    Scientists from Defendant Allergan, Inc., along with co-authors from the University of Chicago, published a scientific article in the peer-reviewed Journal of Ocular Pharmacology and Therapeutics in 2006 and set forth in three sentences the factual and scientific basis for this lawsuit:

> Studies have shown that the bioavailability and efficacy of drops as small as 15 μL are equivalent to those of larger drops.  Therefore, smaller drops would be preferable to minimize systemic exposure and spilled or wasted medication.  Obviously, a smaller drop size would mean that more doses could be dispensed from each bottle of medication, providing cost savings to patients and managed care providers.[4]

8.    Again in 2011, one of these Allergan scientists, writing in the medical e-book *Glaucoma – Current Clinical and Research Aspects*, reaffirmed those principles:  "Smaller size drops on the order of 15 μL, have an efficacy and bioavailability equivalent to larger drops, without the waste.  In fact, drops of this size are preferable, as they minimize systemic exposure and wastage."[5]

9.    Yet Defendants' eye drops are uniformly much larger than 15 μL.  Some are more than three times that size.

10.    There is no legitimate reason why Defendants have not supplied smaller eye drops.  As they have long known, the size of the drop is determined by a factor under their control, the dimensions of the plastic dropper tip.  More than a quarter century ago, eye doctors

---

[4] Richard Fiscella *et al.*, *Efficiency of Instillation Methods for Prostaglandin Medications*, 22 J. Ocular Pharmacology and Therapeutics 477, 478 (2006).

[5] J. Walt and F. Alexander, *Drops, Drops, and More Drops* in Glaucoma – Current Clinical and Research Aspects, (P. Gunvant ed. 2011) at 208.

Electronically Filed - St Louis County - April 17, 2018 - 04:00 PM

created dropper tips in the laboratory that emitted drops of 11 and 19 µL and published the tip

dimensions in the American Journal of Ophthalmology, a peer-reviewed scientific journal.[6]

11.     Yet Defendants have persisted in their unfair, unethical, unconscionable, and

unlawful practices of selling prescription ophthalmic medicine in dispensers that emit much

larger eye drops.  As a result, consumers use more medication than they should, run out of

medicine before they should, and have to buy additional bottles at great expense, providing

increased, but unfair, unethical, and unconscionable profits for Defendants.

12.     What makes the actions of Defendants even worse is the seriousness of the

diseases that their medications treat.  For example, glaucoma, which is caused by an increased

pressure inside the eye, is the leading cause of blindness in African Americans and Hispanics and

the second-leading cause in Caucasians.  It disproportionately affects the elderly on fixed

incomes.  Some of the consequences of glaucoma include the inability to drive, recognize faces,

walk, maintain balance, and read.  According to Allergan, it afflicts more than a million-and-a-

half Americans.  The only successful therapy for glaucoma is to lower the eye's pressure.  Other

than prescription eye drops, there is no commercially available medication to accomplish this

outcome and no commercially available delivery device for this medication other than the eye

drop dispensers in which these medications are sold.  Once diagnosed with the disease, patients

need to take their eye drops every day for the rest of their lives at an annual cost of many

hundreds or even thousands of dollars.

13.     Moreover, the excess portion of the drops that drains through the lacrimal duct

ultimately enters the bloodstream without first undergoing metabolic inactivation in the liver.

---

[6]Brown, Reay H. *et al.*, *Creating Smaller Eyedrops by Reducing Eyedropper Tip Dimensions*, 99 Am. J. Ophthalmology 460-464 (1985).

Electronically Filed - St Louis County - April 17, 2018 - 04:00 PM

This can lead to a risk of side effects such as decreased cardiovascular response to exercise, lowered blood pressure, and emotional or psychiatric effects.

14.     In addition, the size of the drops is so large that it can lead to an additional health risk for these patients by contributing to a situation in which they run out of their medication before their insurer or other third-party payor will reimburse them for a replacement bottle. Because these drugs are so expensive, many patients cannot afford to buy the drugs without reimbursement from their third-party payor and, therefore, go without, placing them at increased risk of loss of vision or complete blindness.

15.     It is manifestly unfair for Defendants to sell products that are sold in a way that compels consumers to buy unneeded amounts and that thereby also creates a risk of harm.  Both aspects – the forced purchase of unneeded amounts and the creation of unwarranted health and safety risks – render Defendants' practices unfair under the policy of the Federal Trade Commission (FTC), which has been incorporated into the Missouri Merchandising Practices Act (MMPA), Mo. Rev, Stat, §407.010 *et seq.*

16.     For all these reasons, Defendants' practices of selling topical prescription ophthalmic pharmaceuticals are unfair and unethical in violation of the MMPA.

17.     Plaintiffs bring this lawsuit on behalf of themselves and proposed Classes of similarly situated consumers and third-party payors who paid all or part of the purchase price of multi-dose bottles of prescription eye drops manufactured by Defendants and sold in Missouri. Plaintiffs seek to redress Defendants' illegal conduct and to recover as damages the excessive costs for inherently wasted medication manufactured and sold by Defendants, as well as punitive and all applicable damages and relief, including fees and costs, made available under the MMPA

Electronically Filed - St Louis County - April 17, 2018 - 04:00 PM

## THE PARTIES

### Plaintiffs

18.     Plaintiff Christine Green is a resident of St. Louis County, Missouri.  During the period encompassed by the applicable statute of limitations, Ms. Green purchased in St. Louis County and used Travatan Z prescription eye drops manufactured and sold by Alcon.

19.     Plaintiff Jordan Pitler is a resident of St. Louis County, Missouri.  During the period encompassed by the applicable statute of limitations, Mr. Pitler purchased in St. Louis County and used Travatan Z prescription eye drops manufactured and sold by Allergan.

### The Alcon Defendants

20.     The Alcon Defendants, Alcon Laboratories, Inc., and Alcon Research, Ltd., are corporations incorporated under the laws of Delaware with their principal place of business at 6201 S. Freeway, Fort Worth, TX 76134.

21.     Defendant Alcon Laboratories, Inc., performs selling, marketing and distribution activities in the United States for Alcon's prescription eye drop products.  Defendant Alcon Research, Ltd., is responsible for Alcon's U.S. manufacturing and research and development operations for Alcon's prescription eye drop products.

22.     The following table lists Alcon's principal brand-name topical ophthalmic pharmaceutical products sold in multi-dose containers for treatment of glaucoma during the applicable class period:

- Travatan
- Travatan Z
- Azopt
- Betoptic
- Betoptic S
- Simbrinza
- Iopidine

6

**The Allergan Defendants**

23.     Two of the Allergan Defendants, Allergan, Inc. and Allergan USA, Inc., are corporations incorporated under the laws of Delaware with their principal place of business at 2525 Dupont Drive, Irvine, California 92612.  The third, Allergan Sales, LLC, is a California limited liability corporation with its principal place of business at the same address.

24.     During the applicable class periods, Allergan manufactured and sold the following prescription eye drop products in multi-dose containers for glaucoma:  Lumigan, Alphagan, Alphagan P, Combigan, and Betagan.

**JURISDICTION AND VENUE**

25.     The Circuit Court of St. Louis County has subject matter jurisdiction over this action and personal jurisdiction over Defendants because the actions complained of regarding Plaintiffs' injuries took place in St. Louis County.  V.A.M.S. 407.025.1.

26.     Venue is proper in the Circuit Court of St. Louis County because the cause of action arose in St. Louis County. V.A.M.S. 407.025.1.

27.     This is a class action filed under Mo Rev. Stat. § 407.025,3(6) and Missouri Supreme Court Rule of Civil Procedure 52.08(b)(2) with respect to the claim for injunctive and declaratory relief and pursuant to Mo. Rev. Stat. § 407.025&7) and Rule 52.08(b)(3) with respect to the claim for actual damages.

**FACTUAL ALLEGATIONS REGARDING DEFENDANTS' LIABILITY**

28.     Plaintiffs' claims are simple:  For many years, Alcon and Allergan have each separately engaged in an unfair, unscrupulous, and unconscionable scheme, in violation of the MMPA, to increase profits by selling prescription eye drops in a form that compels consumers to buy and spend money for expensive medication that inherently goes to waste.  Specifically, Defendants sell these drugs in dispensers that emit drops that are so large that they exceed the

Electronically Filed - St Louis County - April 17, 2018 - 04:00 PM

capacity of the eye, with large portions being expelled from the eye and providing no benefit and a risk of harm.  As a result, Plaintiffs and other Class Members have been compelled to pay for more of Defendants' medication than they should have.

29.     The scientific principles that underlie this claim have been recognized in peer-reviewed medical and pharmaceutical literature over the past four decades, including literature published by, and financially supported by, these very Defendants.  This Petition describes that literature.

**The Amount of Medication That the Eye Can Absorb Is Limited by the Eye's Capacity**

30.     The literature establishes, among other scientific principles, that the volume of the inferior fornix, located in the conjunctival cul-de-sac, is only 7-10 µL under normal conditions. When a large eye drop is added to that volume, it leads to overflow because "[t]he conjunctival sac can only hold momentarily about 20-30 µL of fluid without overflow onto the cheek."[7]  None of that overflow enters the inner eye, which is the site of action of the drug.

31.     These principles have been known for decades.  Physicians with the University of Missouri-Kansas City wrote in the American Journal of Ophthalmology during the 1980s:

> Under normal conditions, the human tear volume is approximately 7 µl. This is divided into the upper and lower marginal tear menisci (3 µL per meniscus for a total of 6 µL) and 1 µL in the precorneal tear film. The eye can hold about 30 µl without overflow if great care is exercised and the subject is not allowed to blink. In the clinical situation, eyedrop administration is followed by reflex blinking, with most of the eyedrop lost to drainage in the first 15 to 30 seconds. Thus, the greatest portion of an administered eye drop is not used for the desired pharmacologic effect.[8]

---

[7] Luc Van Santvliet and Annick Ludwig, *The Influence of Penetration Enhancers on the Volume Instilled of Eye Drops*, 45 Eur. J. Pharmaceutics and Biopharmaceutics 189, 190 (1998).

[8] Charles M. Lederer and Ralph E. Harold, *Drop Size of Commercial Eye Glaucoma Medications*, 101 Am. J. Ophthalmology 691, 694 (1986) (footnote omitted).

Electronically Filed - St Louis County - April 17, 2018 - 04:00 PM

32.    In a major review paper more than a decade ago, scientists from the University of Antwerp Laboratory of Pharmaceutical Testing and Biopharmacy concurred with the above principles:

> Normally, the human tear volume in the palpebral fissure averages 7 µl in the upright position, with 1 µl in the precorneal tear film and about 3 µl in each marginal tear meniscus. The maximum volume that the palpebral fissure can contain without overflowing is estimated at 30 µl under normal conditions when the patient is upright and not blinking. Sudden increases of volume, such as those created by the instillation of eye drops, are diminished rapidly by reflex blinking and tearing and increased rates of drainage. Restoration of the normal tear volume requires about two to three minutes with most of the excess volume lost to overflow and drainage in the first 15-30 seconds. The larger the volume instilled, the more rapidly it is drained through the naso-lacrimal duct system.[9]

33.    More recently, scientists from Emory University Eye Center wrote in the Journal of Glaucoma:

> Under normal conditions, the tear volume in the conjunctival cul-de-sac is 7 to 9 µL in humans with a turnover rate of 0.5 to 2.2 µL/min, and the maximum volume that the conjunctival cul-de-sac can contain is estimated to be 30 µL. Commercial eyedroppers typically deliver between 25.1 and 56.4 µL; with an average drop volume of 39 µL. This sudden increase in volume in the conjunctival cul-de-sac and the irritant properties of the drug cause rapid reflex blinking and increased tear secretion. Most of the drug leaves the conjunctival cul-de-sac through the lacrimal drainage system and the excess is spilled onto the cheeks.[10]

The lacrimal or nasolacrimal drainage system is the route by which tears are drained from the eye through the tear duct into the nasal cavity and from there into the bloodstream.

34.    A scientific textbook entitled *Drug Delivery and Targeting for Pharmacists and Pharmaceutical Scientists* ("Drug Delivery textbook") summed up these principles as follows:

> Under normal conditions the human tear volume is about 7-9 µl and it is relatively constant. The maximum amount of fluid that can be held in the lower eyelid sack

---

[9] Luc Van Santvliet and Annick Ludwig, *Determinants of Eye Drop Size*, 49 Surv. Ophthalmology 197-213 at 197 (2004) (footnotes omitted).

[10] Deepta Ghate and Henry F. Edelhauser, *Barriers to Glaucoma Drug Delivery*, 17 J. Glaucoma 147, 147 (2008 (footnote omitted).

Electronically Filed - St Louis County - April 17, 2018 - 04:00 PM

is 25-30 µ1, but only 3µl of a solution can be incorporated in the precorneal film without causing it to destabilize. When eye-drops are administered, the tear volume is suddenly increased which can cause rapid reflex blinking. Most of the eyedrop is pumped through the lacrimal drainage system into the nasolacrimal duct, and some is spilled on the cheeks and splashed on the eyelashes.[11]

## Equivalence of Effectiveness of Larger and Smaller Eye Drops

35.     Consistent with these principles, scientific studies have shown that larger eye drops are no more effective than drops of 15 µL or smaller.  In fact, larger eye drops may be even less effective than smaller drops.

36.     In 1977, a scientist from the University of Kansas reported in the Journal of Pharmaceutical Sciences that a five-fold reduction in the volume of eye drops instilled in rabbits resulted in the same drug concentration at the active site in the eye as the larger drop.  The study concluded:  "Therapeutically, it should be possible, by reducing the instilled volume by a factor of five, to reduce the dose administered by approximately a factor of three without altering drug concentration at the active site.  This finding is significant and shows that the doses currently used for ophthalmic drugs are generally much larger than required."[12]

37.     A 1984 study in Archives of Ophthalmology by scientists from the University of Arkansas similarly found that a 15 µL "minidrop" of the glaucoma drug clonidine was just as effective in reducing pressure inside the eye as a 70 µL drop.[13]

---

[11] Drug Delivery and Targeting for Pharmacists and Pharmaceutical Scientists (A.M. Hillery, A.W. Lloyd and J. Swarbrick, eds.) at 335 (2001).

[12] Thomas F. Patton, *Pharmacokinetic Evidence for Improved Ophthalmic Drug Delivery by Reduction of Instilled Volume*, 66 J. Pharmaceutical Sci., 1058, 1059 (1977).

[13] Gissur Petursson *et al., Treatment of Glaucoma Using Minidrops of Clonidine*, 102 Archives of Ophthalmology, 1180 (1984).

Electronically Filed - St Louis County - April 17, 2018 - 04:00 PM

38.     Three years later, scientists from the University of Texas Health Science Center and the University of Iowa College of Pharmacy reported in Archives of Ophthalmology that an 8 µL dilating eye drop had the same effect on the eyes of infants as a regular 30 µL drop.[14]

39.     Alcon itself has shown that smaller eye drops are as effective as larger drops.  In a study published in the American Journal of Ophthalmology, three scientists from Alcon, along with scientists from the Johns Hopkins School of Medicine, compared a 16 µL drop of a 0.5% concentration of the glaucoma drug apraclonidine hydrochloride to both a 30 µL drop of that concentration and a 30 µL drop of even a higher concentration, 1.0%.  They found that the 16 µL drop achieved "a similar duration and magnitude of intraocular pressure reduction" to the larger drops.  They concluded that "a 16-µL drop size was both effective and well-tolerated."[15] Nevertheless, Alcon refused to sell its products with such small drops because, as the company's CEO and other top executives told the study's senior author, Dr. Alan Robin of Johns Hopkins School of Medicine, it would mean that patients would be able to use the bottles longer and Alcon would therefore sell less product and make less money.

40.     Allergan has also proven that smaller eye drops are as effective as the larger drops on the market.  In 1989, three scientists from Allergan, along with scientists from Yale University School of Medicine and other leading institutions, published "a randomized, double-masked, parallel, chronic study" comparing the effectiveness and safety of three different drop sizes, 20 µL, 35 µL, and 50 µL, of the glaucoma drug Levobunolol 0.5% (Allergan's branded

---

[14] Mary G. Lynch *et al.*, *Reduction of Phenylephrine Drop Size in Infants Achieves Equal Dilation With Decreased Systemic Absorption*, 105 Archives of Ophthalmology, 1364 (1987).

[15] Vocci (1992), *supra*, at 160.

"Betagan").[16]  The authors found no difference in either safety or effectiveness.  They stated:  "In summary, we found that varying the drop size within the range of 20 to 50  μL has no clinically significant effect on either efficacy or safety of a beta blocker such as Levobunolol." [17]

41.    Based on the above studies and others, the peer-review literature uniformly indicates that smaller eye drops are at least as bioavailable in the eye as larger drops and may even be more bioavailable.  Bioavailability is the extent and rate at which a drug accesses the desired site of action.  A drug must be bioavailable to be effective.

42.    In a thorough review of the world literature related to eye drop size that cited 117 references, Van Santvliet and Ludwig of the University of Antwerp stated that, in contrast with commercially available drops of 26-69 μL, "[f]rom bioavailability and toxicological points of view, even smaller eye drops, of 5 to 15 μL, should be instilled."[18]  In this paper, published in *Survey of Ophthalmology*, they concluded:  "The advantages of reduced drop sizes include equivalent or even improved ocular bioavailability and therapeutic response to the drug."[19]

43.    Similarly, according to the *Drug Delivery* textbook quoted above, smaller drops drain away from the eye at a slower rate than larger drops and are therefore preferable:  "The drainage rate of the solution is related to the instilled volume; the smaller the volume the slower the drainage rate. The instilled drop has been suggested to have an optimum volume of 8-15 μl. However, the typical volumes delivered by commercial eyedroppers are in the range of 35-56 μl."[20]

---

[16] Arthur D. Charap *et al.*, *Effect of Varying Drop Size on the Efficacy and Safety of a Topical Beta Blocker*, 21 Ann. Ophthalmol., 351 (1989).

[17] Charap (1989), *supra,* at 356.

[18] Van Santvliet and Ludwig (2004), *supra*, at 197.

[19] Van Santvliet and Ludwig (2004), *supra*, at 198.

[20] Drug Delivery and Targeting for Pharmacists and Pharmaceutical Scientists, *supra,* at 335.

12

Electronically Filed - St Louis County - April 17, 2018 - 04:00 PM

Electronically Filed - St Louis County - April 17, 2018 - 04:00 PM

### Larger Eye Drops Present a Greater Risk of Systemic Side Effects Compared to Smaller Drops

44.     Most of the excess drug contained in Defendants' prescription eye drops leaves the eye through the lacrimal or tear duct and enters the body's systemic circulation without first undergoing metabolic inactivation in the liver.  One researcher states:  "Sixty to 80 per cent of the dose of an eyedrop will be absorbed systemically though the nasolacrimal duct and nasal mucosa without first-pass metabolism."[21]

45.     The 1989 Allergan study[22] described this process and related it to the therapeutic index of ophthalmic drugs.  The therapeutic index is the balance between the desired result (*i.e.*, treatment of disease) and the risk of harm (*i.e.*, side effects).  As one author stated, "[a] major goal of any therapy is to improve the therapeutic index, *i.e.,* enhance the desired result while minimizing the risk."[23]   The Allergan study stated:

> Since the normal human adult lacrimal lake is approximately 7 µL, commercial eyedrops can increase the volume of fluid in the eye initially by more than seven times.  The excess fluid can roll down the cheek and be a nuisance to the patient.  Of greater medical importance is the absorption of the excess drug through nasolacrimal drainage.

> The pharmacologic effect of absorption is similar to an intravenous injection. The drug enters the bloodstream as a bolus and bypasses the initial hepatic inactivation that occurs with oral medication.  Systemic absorption of ocular medications is of particular concern for drugs such as beta blockers that have potent systemic effects.

> Results of studies in both rabbits and humans support the hypothesis that administering a given quantity of ophthalmic medication in a reduced drop volume may enhance ocular bioavailability, decrease systemic absorption and improve the therapeutic index.  Other studies suggest that reducing the drop size

---

[21] A. Cox, *Systemic Effects of Ocular Drugs*, 2002 Adverse Drug Reaction Bulletin 823, 823.

[22] Charap (1989), *supra*.

[23] Mary G. Lynch, *Reducing the Size and Toxicity of Eye Drops*, Research to Prevent Blindness Science Writers Seminar 20 (1988).

Electronically Filed - St Louis County - April 17, 2018 - 04:00 PM

of existing medications with no compensatory increase in concentration may reduce systemic absorption without sacrificing ocular efficacy. [24]

46.     Those authors also offered an explanation for why the smallest drops that they studied, which were 20 µL, were not safer than the larger drops they studied, 35 and 50 µL. They suggested that improved safety does not occur unless the drops are smaller than 20 µL. They stated:  "[C]linical changes may not be detectable unless the drop-size volume is decreased below a critical volume."[25]

47.     An article by scientists from the Department of Ophthalmology of Truman Medical Center and the University of Missouri-Kansas City concurred that smaller drops would improve the therapeutic index:  "Alteration of eyedrop delivery systems and alteration of the medication's physical properties to produce smaller drops could greatly diminish the cost of topical glaucoma therapy and improve the therapeutic index."[26]

48.     The principle that smaller eye drops have a lower potential for toxic side effects than larger drops has actually been known since the 1970's.  In 1977 a scientist from the Department of Pharmaceutical Chemistry, School of Pharmacy, University of Kansas stated in the Journal of Pharmaceutical Sciences:  "By reducing the instilled volume and, hence, substantially decreasing the applied dose, the potential for toxic effects is reduced while drug concentration in the eye is maintained."[27]

49.     According to the *Drug Delivery* textbook quoted above, "nasolacrimal drainage is the major factor contributing to precorneal drug loss and systemic side-effects.  The local/systemic effect balance can be improved by reducing the size of the eyedrop, and tips

---

[24] Charap (1989), *supra,* at 351-52.

[25] Charap (1989), *supra,* at 355.

[26] Lederer (1986), *supra,* at 694.

[27] Patton (1977), *supra,* at 1059.

Electronically Filed - St Louis County - April 17, 2018 - 04:00 PM

capable of delivering a drop of 8-10 µl have been designed by varying the relationship between the inner and outer diameters of the end of the tip."[28]

50.    Consistent with that principle, the Alcon study that compared 16 and 30 µL drops, found that the smaller drops were "[t]he best tolerated."[29]

51.    According to another study, systemic effects from ocular medication may go undiagnosed but are still experienced by the patient.  In the case of β-andrenoceptor antagonists such as Timolol Maleate (a component of Allergan's Combigan), Levobunolol Hydrochloride (Allergan's Betagan) and other drugs used for glaucoma, systemic effects can include respiratory effects such as bronchospasm; cardiovascular effects such as palpitation, reduced blood pressure, and slowed heart rate; and central nervous system effects such as depression, anxiety, disorientation, and confusion.  The elderly are at increased risk of these effects.  A class of eye drops called $\alpha_2$-adrenoreceptor agonists, such as Brimonidine (Allergan's Alphagan and Alphagan-P), can cause systemic effects such as systemic hypotension, headaches, fatigue, somnolence, and dry mouth.[30]

52.    A table in a pharmacology textbook[31] lists the following systemic effects caused by two classes of glaucoma medications:

---

[28] Drug Delivery and Targeting for Pharmacists and Pharmaceutical Scientists, *supra,* at 339.

[29] Vocci (1992), *supra,* at 154.

[30] Cox (2002), *supra.*

[31] *Clinical Ocular Pharmacology* at 9 (Jimmy D. Bartlett & Siret D. Jaanus, eds., 5th ed. 2008).

Electronically Filed - St Louis County - April 17, 2018 - 04:00 PM

Clinically Significant Systemic Effects Caused by Ocular Medications

| Ocular Drug | Clinical Circumstance Under Which Adverse Effect Occurs | Systemic Effect |
|---|---|---|
| β-Blockers | Treatment of open-angle glaucoma | Decreased cardiac rate, syncope, exercise intolerance, bronchospasm, emotional or psychiatric disorders |
| Brimonidine | Treatment of open-angle glaucoma | Dry mouth, central nervous system effects including fatigue, lethargy |

β-Blockers include Alcon's Betoptic-S and Allergan's Betagan.  Brimonidine is the generic name for Allergan's Alphagan P.  Allergan's Combigan is a combination of the β-Blocker Timolol and Brimonidine.

53.    Prostaglandins and prostaglandin analogues, which include Alcon's Travatan and Travatan Z and Allergan's Lumigan have systemic side effects including "occasional headache, precipitation of migraine in susceptible individuals, skin rash and mild upper respiratory tract symptoms."[32]  In addition, their excessive size causes a risk of local side effects such as lengthening, thickening, and hyperpigmentation of eyelashes, darkening of the iris, and hyperpigmentation of the skin around the eye.[33]

**The Scientific Literature States That Drops Should Be No Larger Than 15 µL**

54.    According to the scientific literature, from the standpoint of bioavailability and reducing risk of side effects, eye drops no larger than 5-15 µL should be used.  Any amount in excess of that range is totally wasted.

55.    This principle has been known for many decades by Allergan as well as the scientific world.  In 1973, Allergan financially supported a paper published by scientists from the School of Pharmacy, University of Wisconsin-Madison, in the Journal of Pharmaceutical

---

[32] J.J. Kanski, Clinical Ophthalmology: A Systematic Approach (2007).

[33] *Id.*

16

Electronically Filed - St Louis County - April 17, 2018 - 04:00 PM

Sciences.  According to these authors, "to maximize activity of drugs in humans, the drop size of ophthalmic delivery systems ought to be reduced from its present 50-75-μL drop to at most a 5- or 10-μL drop."[34]

56.    More recently, citing six references spanning more than two decades, the scientists from the University of Antwerp quoted above stated:  "It has been suggested that a decrease in drop size, to between 5 μl and 15 μl, would reduce the amount of overflow, the rate of drug loss through drainage, the incidence of systemic side effects, and the cost of therapy."[35]

57.    In another paper, those same scientists stated:  "The drop size of commercially available ophthalmic solutions ranges from 25 to 70 μL with an average of about 40 μL.  From a biopharmaceutical and toxicological point of view, however, it is important to instill small volume eye-drops, with an ideal volume of 5-15 μL."[36]

58.    Scientists from McGill University in Montreal and Fluminense Federal University in Rio de Janeiro, writing in the Journal of Clinical Pharmacy and Therapeutics, likewise advocated smaller drops.  "Concerning bioavailability and toxicity," they stated, "drops of 5-15 μL would be ideal."[37]

59.    In a study published in the Journal of Glaucoma in 2008, the scientists from Emory University quoted above also recommended the use of smaller drops, stating:  "Reducing

---

[34] Sukhbir S. Chrai *et al.*, *Lacrimal and Instilled Fluid Dynamics in Rabbit Eyes*, 62 J. Pharmaceutical Sci., 1112 at 1112 (1973).

[35] Van Santvliet & Ludwig (2004), *supra,* at 198.

[36] Luc Van Santvliet and Annick Ludwig, *Influence of the Dropper Tip Design on the Size of Eye-drops* (2001) (footnotes omitted).

[37] M.P. Ventura *et al.*, *Cost Considerations of the New Fixed Combinations for Glaucoma Medical Therapy*, 30 J. of Clinical Pharmacy and Therapeutics, 251, 253 (2005).

Electronically Filed - St Louis County - April 17, 2018 - 04:00 PM

the drop size to 5-15 μL would reduce overflow, decrease systemic absorption, reduce cost of therapy while maintaining equivalent or even enhanced ocular bioavailability."[38]

60.    On information and belief, at all times relevant hereto, Defendants were well-aware of these principles and knew or should have known that the dispensing of prescription eye drops exceeding 15 μL would result in unnecessary wastage of medicine, an increased risk of systemic side effects, and an unnecessary and wasted therapeutic expense to patients and/or their third party payors.

61.    Indeed, Allergan has stated as much to the scientific community on several occasions.  In a 2011 medical e-book on glaucoma, an Allergan scientist wrote:  "Smaller size drops, on the order of 15 μL, have an efficacy and bioavailability equivalent to larger drops, without the waste. In fact, drops of this size are preferable, as they minimize systemic exposure and wastage."[39]

62.    Five years earlier, two Allergan employees co-authored, and Allergan funded, a paper in the Journal of Ocular Pharmacology and Therapeutics that stated:  "Studies have shown that the bioavailability and efficacy of drops as small as 15 μL are equivalent to those of larger drops.  Therefore, smaller drops would be preferable to minimize systemic exposure and spilled or wasted medication."[40]

63.    Even earlier, in 1989, three Allergan scientists, along with co-authors from institutions such as Yale University School of Medicine, published the study described above in which they found that drops of 20 μL were just as effective as drops of 50 μL; in that paper they favorably cited three studies that "suggest that reducing the drop size of existing medications

---

[38] Ghate & Edelhauser (2008), *supra,* at 147.

[39] J. Walt (2011), *supra,* at 208.

[40] Fiscella *et al.* (2006), *supra,* at 478.

Electronically Filed - St Louis County - April 17, 2018 - 04:00 PM

with no compensatory increase in concentration may reduce systemic absorption without sacrificing ocular efficacy."[41]  Nevertheless, neither Allergan nor any of the other Defendants reduced the drop size of their existing medications.

### Defendants' Eye Drops Are Much Larger Than 15 µL

64.    As part of a scheme to increase profits by selling more product than consumers want or need, each Defendant sells ophthalmic medication in bottles that instill drops that are two and three times 15 µL or more.

65.    Research has demonstrated that "commercial eyedroppers typically deliver between 25.1 and 56.4 µL; with an average drop volume of 39 µL."[42]

66.    As the University of Antwerp paper quoted above states, citing eight separate studies, "[o]phthalmologists and hospital pharmacists performing studies to determine the cost per dose and per bottle of eye medication reported eye drop volumes ranging from 26.4 µL up to 69.4 µL."[43]

67.    Studies published in respected peer-reviewed medical and pharmaceutical journals such as the American Journal of Ophthalmology and the Journal of Clinical Pharmacology and Therapeutics published in 1999, 2003, 2005, and 2008 have shown that Defendants' prescription eye drops greatly exceeded the optimum size.[44]  The 1999 paper was financially supported by Merck, a manufacturer of prescription eye drops.  These studies

---

[41] Charap (1989), *supra,* at 352.

[42] Ghate and Edelhauser. *supra,* at 147.

[43] Van Santvliet and Ludwig (2004), *supra,* at 197.

[44] Nathan R. Rylander and Steven D. Vold, *Cost Analysis of Glaucoma Medications*, 145 Am. J. Ophthalmology 106-113 (2008); Ventura *et al.* (2005), *supra*; Richard G. Fiscella *et al., Medical Therapy Cost Considerations for Glaucoma*, 136 Am. J. Ophthalmology, 18-25 (2003); Richard G. Fiscella *et al., Cost Considerations of Medical Therapy for Glaucoma*, 128 Am. J. Ophthalmology, 426-433 (1999).  Some studies report the number of drops per milliliter; drop size is determined by dividing one milliliter by the number of drops per milliliter.

Electronically Filed - St Louis County - April 17, 2018 - 04:00 PM

provided data from which one can calculate drop sizes; they show that Defendants' brand-name

drops uniformly exceeded 15 μL by large amounts (numbers represent the drop sizes in μL):

    68.   **Alcon.**

**Betoptic-S:**

| Bottle Size | 1999 | 2003 | 2008 |
|---|---|---|---|
| 2.5 mL | NA | NA | 43 |
| 5 mL | 34 | 34 | 40 |
| 10 mL | 39 | 39 | 38 |
| 15 mL | 33 | 33 | 37 |

**Timolol Maleate (generic):**

| Bottle Size | 1999 | 2003 | 2008 |
|---|---|---|---|
| 5 mL | 35 | 35 | 32 |
| 10 mL | 32 | 32 | 34 |
| 15 mL | 34 | 34 | 32 |

**Timolol Maleate gel forming (Falcon):**

| Bottle Size | 1999 | 2003 | 2008 |
|---|---|---|---|
| 5 mL | 35 | 35 | 32 |
| 10 mL | 32 | 32 | 34 |
| 15 mL | 34 | 34 | 32 |

**Azopt:**

| Bottle Size | 1999 | 2003 | 2008 |
|---|---|---|---|
| 5 mL | 41 | 41 | 34 |
| 10 mL | 39 | 39 | 34 |
| 15 mL | 40 | 40 | 31 |

**Travatan:**

| Bottle Size | 2003 | 2008 |
|---|---|---|
| 2.5 mL | 29 | 26 |
| 5 mL | NA | 25 |

**Travatan Z:**

| Bottle Size | 2008 |
|---|---|
| 2.5 mL | 29 |
| 5 mL | 30 |

69.    **Allergan.**

**Betagan:**

| Bottle Size | 1999 | 2003 |
|---|---|---|
| 5 mL | 45 | 45 |
| 10 mL | 48 | 48 |
| 15 mL | 49 | 49 |

**Alphagan/Alphagan P:**

| Bottle Size | 1999 | 2003 | 2008 |
|---|---|---|---|
| 5 mL | 47 | 47 | 43 |
| 10 mL | 42 | 42 | 44 |
| 15 mL | 46 | 46 | 43 |

**Lumigan:**

| Bottle Size | 2003 | 2008 |
|---|---|---|
| 2.5 mL | 27 | 31 |
| 5 mL | 29 | 31 |
| 7.5 mL | 29 | 31 |

**Combigan:**

| Bottle Size | 2005 |
|---|---|
| 5 mL | 33 |

70.    Documents of the United States Food & Drug Administration, available at the

FDA's "Drugs@FDA" website, also show that Defendants' prescription eye drops are well over

15 µL.  FDA Pharmacological, Medical and other Reviews of these drugs show the following

drop sizes (numbers are in µL):

21

Electronically Filed - St Louis County - April 17, 2018 - 04:00 PM

**Alcon**

Brimonidine Tartrate 0.015%:  41.8

Travatan:  25

Travatan Z:  25

Vigamox:  38

**Allergan**

Alphagan:  35

Acular LS:  50

Combigan:  35

Elestat:  30-35

Lastacaft:  35

Lumigan 0.3%:  30

71.    Other FDA reviews do not directly specify drop size, but they provide data from which the following drop sizes can be calculated (numbers are in μL):

**Alcon**

Azopt:  50

Moxeza:  50

Nevanac:  50

Simbrinza:  35

**Allergan**

Alocril:  40

Zymaxid:  40

Electronically Filed - St Louis County - April 17, 2018 - 04:00 PM

**Large Eye Drops Cause Substantial Injuries to Consumers**

72.     Defendants' practices of selling prescription eye drops in dispensers that emit drops larger than 15 µL cause substantial injury, both because they compel Class Members to spend more money on their therapy than if the drops were 15 µL and because larger eye drops cause unwarranted health and safety risks.

73.     If the sizes of Defendants' prescription eye drops were limited to the maximum effective size of 15 µL, or even 16 µL, as in the Vocci study, the medication in the bottles would last longer and Class Members would spend substantially less on their therapy than they do with larger, substantially wasted, eye drops.  This principle is not only obvious on its face, but it has been stated repeatedly in the medical and pharmaceutical literature.

74.     This principle that there would have been a cost benefit to patients if drops had been 15 or 16 µL or smaller has been recognized in undisputed, peer-reviewed published literature, including literature that has been acknowledged as valid by Defendants.  The principle has even been stated by Allergan in published literature and has been recognized by Alcon in private discussions.

75.     The principle that there would be a cost savings to consumers if drops were smaller goes back more than 40 years to the 1973 article cited above by Chrai and co-authors from the School of Pharmacy at the University of Wisconsin in Madison, published in the peer-reviewed Journal of Pharmaceutical Sciences.[45]  The authors of that paper reported on a study of the effect of eye drops in rabbits and then related their findings to humans.  They concluded that a smaller drop volume, even as small as 1-5 µL, would provide humans with the maximum results and that another benefit of smaller drops would be lower cost:

---

[45] Chrai (1973), *supra*.

23

Electronically Filed - St Louis County - April 17, 2018 - 04:00 PM

According to Maurice, drainage of an instilled solution in humans is considerably faster than in rabbits. Presumably the rapid rate of blinking causes an acceleration in the rate of drainage. Thus, small volumes of 1-5 μL, provided they can be accurately delivered from an ophthalmic dropper arrangement, would allow for maximum results from an instilled drug.

An important benefit of using a smaller instilled volume, in addition to improved drug activity and *lower cost*, is a potential decrease in side effects from ophthalmic drugs.[46]

76.    Allergan was involved with the Chrai (1973) study in at least two ways. First, the article stated: "Supported by Allergan Pharmaceuticals."[47] Second, the authors stated that they were grateful to Dr. Stuart Eriksen "for invaluable discussions and suggestions."[48] At the time the study was published, Dr. Eriksen was an Allergan employee and at least as of 1980 was a Vice President of the company.[49]

77.    Furthermore, as an indication that Allergan not only was involved with this study but accepted its validity, Dr. Eriksen, identified as being with Allergan, cited and relied on it in a paper he co-authored in 1974.[50]

78.    According to the publisher of the Journal of Pharmaceutical Sciences, the Chrai (1973) paper has been cited 160 times in published literature as of July 19, 2015.[51] Yet, on information and belief, no published work has ever disagreed with the Chrai (1973) statement that an important benefit of a smaller instilled volume would be lower cost.

---

[46] Chrai (1973), *supra,* at 1119 (emphasis added).

[47] Chrai (1973), *supra,* at 1121.

[48] Chrai (1973), *supra,* at 1121.

[49] Dr. Eriksen was identified as being with Allergan in 1970 in the Second Annual Conference on Antiviral Substances, 173 Annals of the New York Academy of Sciences, 113, 116 (1970). He identified himself as a Vice President of Allergan in 1980. S. Eriksen, *Letters to the Editor*, 6 Contact & Intraocular Lens Med. J., 338 (1980).

[50] Sukhbir S. Chrai, Michael C. Makoid, Stuart P. Eriksen *et al.*, *Drop Size and Initial Dosing Frequency Problems of Topically Applied Ophthalmic Drugs*, 63 J. Pharm. Sci. 333, 333 (1974) ("Based on this work [Chrai 1973], it is reasonable to assume that instillation of multiple drops will result in an increased drainage rate due to a volume buildup.")

[51] http://onlinelibrary.wiley.com/doi/10.1002/jps.2600620712/citedby (accessed 7/19/2015).

Electronically Filed - St Louis County - April 17, 2018 - 04:00 PM

79.    In 1986, Drs. Reay H. Brown and Mary G. Lynch of Emory University addressed the issue of whether smaller eye drops would provide cost savings and concluded that they would.  They stated in the peer-reviewed American Journal of Ophthalmology:

> Drop size and method of delivery are also important *from an economic standpoint* since tips that deliver large or multiple drops increase costs.
>
> ***
>
> The safety *and economy* of any topical medication should be enhanced with eyedropper tips designed to deliver small, single drops consistently.[52]

80.    On information and belief, no publication has disagreed with the statement by Drs. Brown and Lynch that the economy of any topical medication should be enhanced with eyedropper tips designed to deliver small, single drops consistently.

81.    That same year Drs. Charles M. Lederer, Jr., and Ralph E. Harold from the Department of Ophthalmology of Truman Medical Center and the University of Missouri-Kansas City showed in detail how much the savings would be from smaller eye drops.  In a paper published in the peer-reviewed American Journal of Ophthalmology, they stated: "In addition to the pharmacologic advantages of a smaller drop, there are significant economic implications."[53]  They offered the following example of economic benefits that would be derived from drops of only 15 µL:

> The economic impact of using a smaller drop may be illustrated by Propine 0.1 %.  An average bottle labeled 15.0 ml actually contained an average of 15.5 ml with a drop volume determined to be 39.8 µl.  The average bottle yielded 389 eyedrops, sufficient for 13.9 weeks of therapy (both eyes, twice daily use).  If the eyedrops were 75 µl, the upper limit quoted in the literature, the bottle would yield only 207 drops, sufficient for 7.4 weeks of therapy.  If the eyedrops could be reduced to 15 µl (shown to be effective with clonidine eye drops), the average bottle

---

[52] Reay H. Brown and Mary G. Lynch, *Design of Eyedropper Tips for Topical Beta-Blocking Agents*, 102 Am. J. Ophthalm., 123, 124 (1986) (emphasis added).

[53] Lederer (1986), *supra,* at 694.

Electronically Filed - St Louis County - April 17, 2018 - 04:00 PM

would yield 1,033 drops, sufficient for 36.9 weeks of therapy. ***The smaller 15-µl drop would effect a medication savings of 265% compared with the samples tested in this study. Alteration of eyedrop delivery systems and alteration of the medication's physical properties to produce smaller drops could greatly diminish the cost of topical glaucoma therapy*** and improve the therapeutic index.[54]

82.    On information and belief, no published work has disagreed with the statements by Drs. Lederer and Harold regarding the economic implications of a smaller drop, including the statement that alteration of eye drop delivery systems could greatly diminish the cost of topical glaucoma therapy.

83.    In 2004, Van Santvliet and Ludwig of the University of Antwerp published a landmark review paper, "*Determinants of Eye Drop Size*" in Survey of Ophthalmology. "Survey of Ophthalmology is a clinically oriented review journal designed to keep ophthalmologists up to date. Comprehensive major review articles, written by experts and stringently refereed, integrate the literature on subjects selected for their clinical importance."[55]  Van Santvliet and Ludwig (2004) cited no fewer than 117 references.

84.    At the very outset of their article in the first two sentences of the Abstract, the authors of Van Santvliet and Ludwig (2004) stated that smaller eye drops no larger than 15 µL would be more economical than larger existing drops:

> Ophthalmic solutions are available for multidose or single-dose administration in a wide variety of glass and plastic dropper bottles which deliver drops with a volume between 25 and 70 µl. From a biopharmaceutical ***and economic point of view,*** however, ***smaller volumes of 5 to 15 µl should be instilled***.[56]

85.    The following screenshot, taken from the first page of Van Santvliet and Ludwig (2004), shows the prominence to which the authors gave the above statement:

---

[54] Lederer (1986), *supra,* at 694 (emphasis added; footnote omitted).

[55] http://www.surveyophthalmol.com/content/aims (last accessed 7/19/2015).

[56] Van Santvliet and Ludwig (2004), *supra,* at 197 (emphasis added).

26

Electronically Filed - St Louis County - April 17, 2018 - 04:00 PM

SURVEY OF OPHTHALMOLOGY VOLUME 49 • NUMBER 2 • MARCH–APRIL 2004

ELSEVIER

# THERAPEUTIC REVIEWS

JOEL MINDEL, EDITOR

## Determinants of Eye Drop Size

Luc Van Santvliet, PhD, and Annick Ludwig, PhD

*University of Antwerp (U.I.A.), Laboratory of Pharmaceutical Technology and Biopharmacy, Antwerp, Belgium*

**Abstract.** Ophthalmic solutions are available for multidose or single-dose administration in a wide variety of glass and plastic dropper bottles which deliver drops with a volume between 25 and 70 µl. From a biopharmaceutical and economic point of view, however, smaller volumes of 5 to 15 µl should be instilled. In this review, the technical, pharmaceutical, and therapeutic aspects of eye drop formation and delivery are presented. The different types of containers are described and the determinants of eye drop size are discussed, such as the design and physical characteristics of the dropper tip and bottle, the physico-chemical properties of the solution, and the manner in which the patient dispenses the drops. Preferred and alternative instillation techniques and aids to facilitate the administration of eye drops by elderly patients are described. (Surv Ophthalmol 49:197–213, 2004. © 2004 Elsevier Inc. All rights reserved.)

**Key words.** administration aids • drop dispensing • eye drop administration • eye drop size • ophthalmic solutions • packaging

86.    In the body of the article, the authors stated:  "It has been suggested that a decrease in drop size to between 5 µl and 15 µl, would reduce the amount of overflow, the rate of drug loss through drainage, the incidence of systemic side effects, ***and the cost of therapy***."[57]  To support this statement, the authors cited six separate references.

87.    On information and belief, no published work has disagreed with Van Santvliet and Ludwig (2004), regarding the benefits of smaller drop sizes, including the statement that from an economic point of view drop volumes of 5-15 µL should be instilled.

---

[57] Van Santvliet and Ludwig (2004), *supra,* at 198 (emphasis added).

27

Electronically Filed - St Louis County - April 17, 2018 - 04:00 PM

88.    In 2005, Ventura and other authors, writing in the peer-reviewed Journal of Clinical Pharmacy and Therapeutics, stated that the cost of glaucoma therapy is based on drop size, among other factors, and that the ideal drop size would be 5-15 µL:  "Final cost of therapy may be based on several factors beyond that of the retail price and include the drop size and the amount of drops per bottle.  Concerning bioavailability and toxicity, volume drops of 5-15 µL would be ideal, however reported eye drop volumes range from 26.4 up to 69.4 µL."[58]

89.    On information and belief, no published work has disagreed with the statements by Drs. Ventura and co-authors that the final cost of therapy may be based on the drop size and that the ideal size is 5-15 µL.

90.    The following year, 2006, Zdenka Šklubalová and Zdenek Zatloukal of the Department of Pharmaceutical Technology of Charles University in Prague, stated in the peer-reviewed journal Drug Development and Industrial Pharmacy that a reduction in drop size to 15 µL would reduce the cost of therapy:

> The maximum volume of fluid held in the cul-de-sac without overflowing onto the cheek was estimated at about 20 to 30 µl of fluid (Mishima et al., 1966).  The average drop size of commercially available topical eye medications has been found to be of about 39 µl, within a range of 25-56 µl (Lederer & Harold, 1986).  Volume instilled in excess results in the patient's reflex blinking, which accelerates the elimination process through the nasolacrimal system into the nasal cavity.  From a biopharmaceutical and toxicological point of view, it has been suggested that the decrease in drop size to between 5-15 µl would reduce the rate of drug loss through drainage, the incidence of systemic toxic effects, and, in addition, ***the cost of therapy*** (Patton et al., 1999).[59]

---

[58] M.P. Ventura *et al.*, *Cost Considerations of the New Fixed Combinations for Glaucoma Medical Therapy*, 30 J. of Clinical Pharmacy and Therapeutics, 251, 253 (2005).

[59] Zdenka Šklubalová and Zdenek Zatloukal, *Study of Eye Drops Dispensing and Dose Variability by Using Plastic Dropper Tips*, 32 Drug Devel. and Indus. Pharm., 197, 198 (2006) (emphasis added).

Electronically Filed - St Louis County - April 17, 2018 - 04:00 PM

91.     On information and belief, no publication has disagreed with the statement by Šklubalová and Zatloukal regarding the impact of a reduction in drop size to 5-15 µL on cost of therapy.

92.     In 2008, Deepta Ghate and Henry F. Edelhauser of Emory University expressed the same principle in a review article in the peer-reviewed Journal of Glaucoma.[60]  Dr. Edelhauser was a past recipient of the Alcon Research Award.[61]  These authors stated:

> Commercial eyedroppers typically deliver between 25.1 and 56.4 µL; with an average drop volume of 39 µL.  This sudden increase in volume in the conjunctival cul-de-sac and the irritant properties of the drug cause rapid reflex blinking and increased tear secretion.  Most of the drug leaves the conjunctival cul-de-sac through the lacrimal drainage system and the excess is spilled onto the cheeks.  The drug thus resides in the conjunctival cul-de-sac for only 3 to 5 minutes.  ***Reducing the drop size to 5-15 µL would*** reduce overflow, decrease systemic absorption, ***reduce cost of therapy*** while maintaining equivalent or even enhanced ocular bioavailability.[62]

93.     On information and belief, no publication has disagreed with the statement by Drs. Ghate and Edelhauser that reducing the drop size to 5-15 µL would reduce cost of therapy.

94.     That same year, the textbook *Albert & Jakobiec's Principles and Practice of Ophthalmology* (3d ed. 2008) recognized that the adverse effects of too-large eye drops were both medical and economic.  In a chapter co-authored by Mark B Abelson, a member of the Alcon Laboratories Ophthalmology Hall of Fame,[63] this book stated:

> The volume of liquid that the conjunctival sac can contain is ~ 20-30 µL and the volume of the tear film is 7 ± 2 µL.  Due to physical limitations of eye drop size when delivered from a standard dropper, however, most bottles deliver 30-50 µL instead of the ideal drop size of 10-20 µL.  The delivery of this larger volume

---

[60] Ghate and Edelhauser (2008), *supra*.

[61] Faculty and Physicians, Henry F. Edelhauser, Ph. D., http://www.eyecenter.emory.edu/faculty/edelhauser.htm (last accessed 7/18/2005).

[62] Ghate and Edelhauser (2008), supra, (emphasis added; footnotes omitted).

[63] Andover Eye: Our Physicians: http://www.andovereye.org/physicians/ (accessed 7/18/2015; click on "continue reading" under the reference to Mark B. Abelson).

Electronically Filed - St Louis County - April 17, 2018 - 04:00 PM

> causes reflex blinking, which increases the drainage rate to the nasolacrimal canal, spilling on the cheeks and splashing the excess of the solution to the eyelashes.  This results in **both wasted amounts of medication and** possible negative side effects due to high systemic absorption.[64]

These two possible drawbacks from overly large eye drops are medical, in the form of negative side effects from high systemic absorption, and economic, in the form of the cost of wasted amounts of medication; this book is stating that both of these result from overlarge drops.

95.    Several eye drop manufacturers, including the Defendants, have agreed with the principle expressed in the eight publications cited above.  For example, a study by Hartenbaum and other authors from Merck, as well as Tufts University School of Medicine, published in the Pharmacoeconomics section of the American Journal of Managed Care in 1996, cited the 1985 Brown study that measured the drop sizes from different dropper tip configurations created by the authors, and stated:

> Many factors influence the daily cost of therapy for eyedrops.  In a study of drop size, Brown et al [citing Brown (1985)] concluded that the design of eyedropper tips is important because it determines the size and flow rate of the bottle.[65]

Significantly, the 1985 Brown study did not itself discuss cost of therapy.  It merely related eyedropper design to drop size.  The conclusion relating the design of eyedropper tips to the daily cost of eye drop therapy was that of the Merck (and Tufts) authors.

96.    Fiscella (2006), co-authored by two scientists from Allergan, also agreed that smaller eye drops would provide cost savings to patients and managed care providers.  That paper reported on a study to estimate the most efficient angle for instillation of glaucoma drugs

---

[64] Denise K. Chun, Aron Shapiro, and Mark B. Abelson, *Ocular Pharmaceutics*, 179, 185 in Albert & Jakobiec's Principles and Practice of Ophthalmology (3d ed. 2008) (footnotes omitted).

[65] Hartenbaum (1996), *supra,* (footnote omitted).

Electronically Filed - St Louis County - April 17, 2018 - 04:00 PM

manufactured by Allergan, Alcon, and Pfizer.  In the Introduction section of the article,

explaining why the authors were conducting this investigation, they stated:

> ***Instillation of a smaller-size drop would be desirable*** because the volume of individual drops dispensed by most bottles of ophthalmic medications exceeds the maximum volume that the palpebral fissure can accommodate, which is approximately 30 μL.  Normal tear volume is estimated to be 7-10 μL, giving a net volume available for instillation of 20-23 μL.  Any medication in excess of 20-23 μL probably overflows immediately after administration.  Because normal tear volume is restored within 2-3 min by reflex blinking, tearing, and drainage through the nasal-lacrimal duct, additional medication is probably lost as well.  By waiting 5 min in between administration of eye drop solutions, the effect of diluting the first medication is minimized.

> Studies have shown that the bioavailability and efficacy of drops ***as small as 15 μL*** are equivalent to those of larger drops.  ***Therefore, smaller drops would be preferable to minimize systemic exposure and spilled or wasted medication. Obviously, a smaller drop size would mean that more doses could be dispensed from each bottle of medication, providing cost savings to patients and managed care providers.***[66]

97.    The statement regarding cost savings was general and not limited to Allergan's

products.  Indeed, even if one were to conclude that the statement was limited to products

examined in this study, that would include both Alcon and Allergan.  However, there is no

indication from the context of the article that the authors were limiting these general principles to

any specific products or any specific companies.

98.    Nor is there any indication from the context of the statement regarding cost

savings that the authors were limiting the statement to existing bottles of medication held at

different angles.  There are several reasons to conclude that the statement was not so limited and

applies to 15 μL drops compared to existing drops.

99.    *First*, this statement was made in the Introduction section of the article, before the

authors had reported what they found regarding drop sizes from different angles of instillation.

---

[66] Fiscella (2006), *supra,* at 478 (emphasis added; footnotes omitted).

Electronically Filed - St Louis County - April 17, 2018 - 04:00 PM

They were explaining general principles regarding eye drops, not the implications of their findings.

100.    *Second*, the passage regarding the benefits of smaller drop sizes, including cost savings, immediately follows the statement that 15 µL drops are equivalent to larger drops. Thus, in this context it is clear that the authors were saying that 15 µL drops would provide cost savings compared to larger drops.  However, none of the drops studied by the authors were that small or even close.  Bimatoprost, an Allergan product (brand name:  Lumigan), was 28.7 µL.  Travaprost, an Alcon product (brand-name Travatan), was 25.4 µL.  Latanoprost, a Pfizer product (brand-name:  Xalatan), was 32.0 µL.  Indeed, there was no 15 µL drop on the market at the time of the study, and there is none today.  Thus, to say that drops of 15 µL would provide cost savings is saying that smaller drops than those currently on the market would provide cost savings.

101.    *Third*, if by the sentence they wrote at the end of the passage quoted above ("Obviously, a smaller drop size would mean that more doses could be dispensed from each bottle of medication, providing cost savings to patients and managed care providers."), the authors had meant, "Obviously, if patients could change the way they dispensed the drop from existing bottles so as to reduce the drop's size, that would provide cost savings to patients and managed care providers," they could have easily said so directly.  Instead, they wrote that sentence in the same generalized way as the previous portion of that discussion, mentioning "drop size" without limitation.

102.    *Fourth*, the principle that drops of 15 µL would provide cost savings compared to larger drops is consistent with six publications cited above that were in the literature at the time Fiscella (2006) was published.  Those six publications include the landmark Van Santvliet and

Ludwig (2004) review paper, which Fiscella (2006) cited in the same paragraph in which it made the "cost savings" statement.[67]  In fact, Fiscella (2006) cited Van Santvliet and Ludwig (2004) a total of seven times.

103.    *Finally*, five years later, John Walt of Allergan, one of the co-authors of Fiscella (2006), made nearly the same statement in a chapter on eye drop medications in a textbook on glaucoma[68] and explicitly stated that 15 µL drops would be preferable to larger drops in part because they would minimize waste.  Referring to eye drop medications generally, he stated:

> The volume of the drop dispensed into the eye varies with the medication, but in most cases exceeds the volume that the palpebral fissure can accommodate, which is 30 µL. (Van Santvliet and Ludwig, 2004)  Since normal tear volume is 7 µL-10 µL, the volume available for instillation is 20 µL-23 µL.  Smaller size drops, *on the order of 15 µL*, have an efficacy and bioavailability equivalent to larger drops, without the waste.  In fact, ***drops of this size are preferable, as they minimize systemic exposure and wastage.***[69]

104.    As with the Albert and Jakobiec textbook quoted above, Walt is stating that there are two benefits from smaller drops, less systemic exposure and less wastage.  The detriment from systemic exposure is the risk of side effects.  *See* Albert and Jakobiec ("possible negative side effects due to high systemic absorption.").  The detriment from wasted medication is economic in the form of increased costs.  Those increased costs would not be wiped out by price adjustment.  If companies such as Allergan, Walt's employer, would simply adjust their prices to eliminate any economic benefit to consumers from smaller drops, there would be no benefit from the minimization of wastage from larger drops as Walt said there would be.  Walt's statement that drops on the order of 15 µL are preferable in part because they minimize wastage therefore shows that there would be an economic benefit from drops of 15 µL.

---

[67] Fiscella (2006), *supra,* at 478 n. 14.

[68] Walt (2011), *supra,* at 197-222.

[69] Walt (2011), *supra,* at 208.

105.    Accordingly, including three company publications, there are at least 11 published works that have espoused the principle that smaller drops would provide cost savings to patients and third-party payors.  Not considering the three company articles, the publications were written by a total of 23 separate scientists and were published in six separate peer-reviewed journals and one textbook.  So far as Plaintiffs are aware, those statements are uncontradicted anywhere in the published literature, and therefore Plaintiffs allege upon information and belief that the statements have been uncontradicted in any publication.

106.    In addition, top executives of Alcon stated privately to Dr. Alan Robin that Alcon was unwilling to reduce the size of its eye drops because if it did, it would sell less product and make less money.

107.    During the 1990s, Dr. Robin, an ophthalmologist with Wilmer Institute of Johns Hopkins School of Medicine and Sinai Hospital in Baltimore, was a consultant to both the research and marketing departments of Alcon.  He traveled to Alcon's Headquarters in Fort Worth for periodic meetings with the top officials in these departments, and in addition made one trip to meet with Alcon officials and its advertising agency in Chicago.  In these meetings they discussed such topics as Alcon's new product development and how to make effective presentations to persuade physicians that Alcon's glaucoma drugs were superior to those of other companies.  Dr. Robin was also the senior author of the Vocci study that found that 16 µL drops of Alcon's glaucoma drug apraclonidine were as effective as larger drops.  Three Alcon scientists were co-authors of that study with Dr. Robin.

108.    After the data from the Vocci study was analyzed and the investigators determined that 16 µL drops were as effective as larger drops and again after the article was published in 1992, Dr. Robin recommended to Alcon that it reduce the size of its eye drops so

34

that the bottles would last longer, patients would not run out of medicine so fast and the costs of patients' therapy would be reduced.

109.    He made this recommendation to top officials of Alcon, including Alcon's president and CEO Tim Sear, with whom he would often visit when he had a meeting near Mr. Sear's office on the top floor of the Alcon building.

110.    Dr. Robin also made this recommendation to several of the company's other senior marketing executives (in addition to Mr. Sear, whose responsibilities of course included marketing). These included Bill Barton, who was involved with glaucoma products in the 1990s and beginning in or around 1996 was vice president of marketing of ophthalmic products; Stuart Raetzman; and Scott Manning. He also made the same recommendation to Dr. Billie York, Alcon's vice president of research and a co-author of the Vocci paper; as well as others.

111.    The uniform answer that Dr. Robin received from these Alcon executives was that Alcon was unwilling to reduce the drop size because, if it did, it would sell less product and make less money. None of these executives offered any other reason why Alcon would not reduce drop size. None of them said that, if Alcon did reduce drop size, it would increase the price of a bottle of medicine to eliminate the cost savings patients would otherwise experience. They simply said that Alcon was unwilling to reduce drop size because the company would make less money.

112.    The fact that Alcon was unwilling to reduce drop size because it would sell less product and make less money shows that consumers were paying more for their therapy with larger drops than they would if drops were smaller. Sales of less product by Alcon equals purchases of less product by consumers. Less money for Alcon from sales of its medications

Electronically Filed - St Louis County - April 17, 2018 - 04:00 PM

Electronically Filed - St Louis County - April 17, 2018 - 04:00 PM

equals less money from payers of that money for purchases of that same medication used for their therapy.

113.    The amount of overpayment that consumers and other payors have been compelled to make because of overly large prescription eye drops is substantial.  For example, according to Rylander *et al.*, the average drop size for Allergan's glaucoma drug Alphagan P 0.15% in a 5 mL bottle was 43 µL, and the bottle held 5.17 mL of medication.[70]  At the recommended dose of one drop in each affected eye three times daily, a 5 mL bottle would last a patient with bilateral glaucoma 20 days.  That patient would go through 18.25 bottles in a year.  In July 2013, a 5 mL bottle of Alphagan P at www.drugsdepot.com cost $104.99.[71]  A year's course of treatment would therefore cost approximately $1,915.  However, approximately 65% of the medication, the amount over 15 µL, would be wasted.  If the drops had been only 15 µL, the patient would have needed only 6.46 bottles a year, or 7.0 bottles if the drops had been 16 µL, as in the Vocci study.  The unneeded medication would cost the patient more than $1,100 a year.

114.    A similar analysis shows that the use of Alcon's Betoptic S can cost a consumer $596 a year in wasted medication.

115.    The overall amounts that consumers and third-party payors have been compelled to spend on medication that provided no benefit because of the unfair, unethical, and unconscionable practices of these Defendants can be multiplied many times over when all of the Defendants' prescription eye drops are considered.

---

[70] Rylander, Nathan R. and Steven D. Vold, *Cost Analysis of Glaucoma Medications*, 145 Am. J. Ophthalmology, 106-113 (2008).

[71] http://www.drugsdepot.com/catalog.php/drugsdepot/dt/pd2012060/Alphagan_P_.15_Drops_1X5_ml_Mfg._By_-Allergan_Inc (accessed December 5, 2013).

Electronically Filed - St Louis County - April 17, 2018 - 04:00 PM

116.    Furthermore, as described above, the large drop sizes of Defendants' prescription eye drops cause much of the medication to pass through the tear duct and, without first being metabolically inactivated, enter the patient's circulation where it causes a risk of systemic side effects.

117.    In addition, the large drop sizes of these products contributes to a situation where many glaucoma patients run out of medication before their insurance or managed care plan will reimburse them for a new bottle of medication.  They thus have to choose between paying the full price of the drug themselves or going without.  However, because of the high prices of these medications, many consumers cannot afford to pay for them without third-party reimbursement. Therefore, they either go without their needed medications or attempt to "ration" them by, for example, using them every other day rather than the prescribed daily use.

118.    As a result, because they cannot afford to use their medication every day as prescribed, these consumers run the risk of a decline in their eyesight or going completely blind.

**Consumers Could Not Reasonably Have Avoided This Injury**

119.    Consumers could not reasonably have avoided the injuries they sustained as a result of using prescription eye drops that are larger than the capacity of their eyes.  There are several reasons for this.

120.    First, individual patients do not choose which drugs to take; they are prescribed their drugs by their physicians.  Once the doctor has prescribed a prescription eye drop, the patient has no alternative other than rejecting the physician's advice and foregoing the treatment entirely.

121.    Moreover, wastage cannot be avoided by switching to an alternative medication because all prescription eye drops are substantially larger than 15 µL and therefore lead to wastage.

Electronically Filed - St Louis County - April 17, 2018 - 04:00 PM

122.     Besides that, it is impossible to instill less than one eye drop into an eye.  Thus, a consumer must consume the entirety of the excessively large drop supplied by the manufacturer, even though only a portion provides any benefit.

123.     Nor is there a reasonable alternative from non-pharmaceutical treatments such as surgery and lasers.  This is clearly shown in the scientific literature

124.     Alcon's John Walt stated in his chapter, "Drops, Drops and More Drops," in the textbook Glaucoma – Current Clinical and Research Aspects (2011):  "Conventional treatment usually begins with topical medications, since they are equally as effective as surgical or laser treatment, and their noninvasiveness imposes less risk.  (Musch et al., 2009)  At some point, if medical options are unsuccessful at lowering IOP, surgery may be considered."[72]

125.     The textbook Clinical Ocular Pharmacology stated in its 5th edition (2008):  "The decision to use or refrain from using drugs for diagnosis or treatment is often straightforward. … Pharmacologic intervention is needed for patients who have glaucoma."[73]

### There Are No Countervailing Benefits from Eye Drops that Are Larger than the Capacity of the Eye

126.     Furthermore, the injuries of Plaintiffs and Class Members are not outweighed by any offsetting consumer or competitive benefits.  In fact, there are no consumer or competitive benefits from the excessive sizes of Defendants' eye drops.

127.     Thus, there is no valid, legitimate or ethical reason why Defendants have not supplied prescription eye drops in bottles that dispense drops no larger than 15 μL or 16 uL as in the Vocci study.  The only reason Defendants make their eye drops as large as they are is to sell more product.

---

[72] Walt (2011), *supra,* at 198.

[73] Clinical Ocular Pharmacology, *supra,* at 3.

Electronically Filed - St Louis County - April 17, 2018 - 04:00 PM

### The Sizes of Defendants' Eye Drops Are Within Their Control

128.     Defendants are, and have been, able to sell their medications in dispensers
emitting smaller drops.  The size of the drops emitted by the dropper depends on the specific
dropper tip used, a factor entirely within the control of the manufacturer.  In 1988, Dr. Mary
Lynch of Emory University told the Tenth National Science Writers Seminar in Ophthalmology,
sponsored by the organization Research to Prevent Blindness:  "The size of an eyedrop is
determined by the dimensions of the eyedropper tip: the inner diameter or hole and the outer
diameter of the tip."[74]

129.     This is a principle that Allergan recognizes.  In his e-book chapter, the Allergan
scientist quoted above stated that the size of eye drops "depends on the design and dimensions of
the dropper tip …."[75]

130.     Thus, Defendants could substantially reduce drop size simply by changing the
design and dimension of the dropper tip.  In 1985, the Wilmer/Johns Hopkins and Bascom
Palmer scientists mentioned above reported that "[c]hanges in the dimensions of an eyedropper
tip can alter eyedrop volume markedly."  By experimenting with different dimensions, they were
able to create dispensers that emitted drops of only 11 μL and 19 μL.  To assist anyone who
wanted to manufacture these dispensers to make smaller drops available commercially, they
published the dimensions of their newly created tips.[76]

131.     The authors also included the following photograph comparing a standard-sized
eye drop to a 19 μL drop that they created:

---

[74] Lynch (1988), *supra,* at 20.

[75] Walt (2011), *supra,* at 208.

[76] Brown *et al.* (1985), *supra.*

Electronically Filed - St Louis County - April 17, 2018 - 04:00 PM



**Fig. 2** (Brown, Hotchkiss, and Davis). A standard-sized eyedrop (left) from a commercial eyedropper tip compared to a smaller eyedrop produced by one of the smaller tips we used (outer diameter = 0.047 inch; inner diameter = 0.020 inch).

132.    On information and belief, neither of the Defendants has ever publicly criticized this study or suggested that it has any limitations. Merck recognizes its validity. In a paper that showed the significant effect drop size can have on the costs consumers bear for eye drops, Merck's employees stated: "Many factors influence the daily cost of therapy for eyedrops. In a study of drop size, Brown *et al.* concluded the design of eyedropper tips is important because it determines the size and flow rate of the bottle."[77]

133.    Three years after the Brown study was published, one of its co-authors, Dr. Mary Lynch, told the Tenth National Science Writers Seminar in Ophthalmology that she was by then able to create droppers that would consistently emit drops of only 8 to 10 μL and could thereby enhance the desired result from eye drops. She stated:

A major goal of any therapy is to improve the therapeutic index, *i.e.,* enhance the desired result while minimizing the risk. One way to improve the therapeutic index of an eyedrop is to reduce the size of the eyedrop. By varying the relationship between the inner and outer diameters of the end of the tip, the size of an eyedrop can be altered. We have designed eyedrop tips that can consistently deliver eyedrops as small as 8 to 10 microliters.[78]

---

[77] Hartenbaum (1996), *supra,* at 162.

[78] Lynch (1988), *supra,* at 21.

Electronically Filed - St Louis County - April 17, 2018 - 04:00 PM

134.    In 1992, scientists from Alcon co-authored a paper, described above, in which a smaller drop size was compared to a standard drop.  For the smaller drop, the authors used "a potentially commercially available eyedrop bottle that delivers a 16-µl drop size."[79]  The authors reported that the users of that bottle "agreed it was easier to squeeze and deliver one drop with this bottle and therefore preferred the new eyedrop bottle to the conventional eyedrop bottle."[80]  Nevertheless, Alcon has never sold eye drops using that bottle because, as described above, it would sell less product if it did.

135.    Recently, a standard textbook in the field, Clinical Ocular Pharmacology, reported that "it is practical to dispense accurately measured drops as small as 2 to 5 µL by reducing the bore size of commercial dropper dispensers."[81]

136.    Nevertheless, Defendants have persisted in selling their drops in droppers that emit much larger drops.

### Other Factors that Might Influence the Size of Eye Drops Do Not Prevent Defendants from Reducing the Sizes of their Eye Drops

137.    Although there are other factors, such as the viscosity and surface tension of the liquid and the dispensing angle that can influence the size of eye drops, none of those factors prevents Defendants from reducing drop size by changing their dropper tips.

138.    For any given topical ophthalmic medication, the viscosity and surface tension of the liquid are a constant and do not prevent Defendants from reducing drop size by changing the dimensions of their dropper tips.

---

[79] Vocci (1992), *supra,* at 157.

[80] Vocci (1992), *supra,* at 159.

[81] Clinical Ocular Pharmacology at 18 (Jimmy D. Bartlett & Siret D. Jaanus, eds., 5th ed. 2008).

Electronically Filed - St Louis County - April 17, 2018 - 04:00 PM

139.    Nor does any variability because of the dispensing angle prevent Defendants from reducing drop size.  Studies have found that the dispensing angle has either no effect or a small effect on drop size.

140.    A 1992 study compared the size of drops when the bottle was held vertically and at 135° (*i.e.*, halfway between vertical and horizontal).[82]  The results for Alcon's Betoptic and Betoptic S and other eye drops "provided a consistently measured dose regardless of the angle at which the bottle was held …."  The drops of the fifth product, Allergan's Betagan, were 14.5% smaller when dispensed obliquely than when dispensed vertically at room temperature but were still more than three times the ideal size (47 μL vs. 55 μL).

141.    A study by Merck found no statistically significant difference in the drops of B Levobunolol when drops were dispensed vertically or at an oblique angle for all three bottle sizes.  Nor was there a significant difference for Merck's own product, Timoptic-XE.[83]

142.    The two scientists from the University of Antwerp quoted above have studied the differences between holding a bottle vertically and at 45°, using at least four different commercially available dispenser tips and 10 separate solutions that they formulated for experimental purposes.[84]  Depending on the dispenser-solution combination, they found either a negligible difference or a variance of between 2% and about 10%.

---

[82] S.F. Ball *et al.*, *Cost of B-Adrenergic Receptor Blocking Agents for Ocular Hypertension*, 110 Arch. Ophthalmol., 654 (1992).

[83] Hartenbaum (1996), *supra,* at 161.

[84] L. Van Santvliet and A. Ludwig studies:  *Influence of the physico-chemical properties of ophthalmic viscolysers on the weight of drops dispensed from a flexible dropper bottle*, 7 Eur. J. Pharm. Sci., 339 (1999); *Dispensing Eye Drops from Flexible Plastic Dropper Bottles.  Part II: Influence of the physico-chemical properties of the formulation and the manipulation technique by the patient*, 61 Pharm. Ind., 194 (1999); and *Influence of the Dropper Tip Design on the Size of Eye-Drops*, 63 Pharm. Ind., 402 (2001); Van Santvliet and Ludwig (2004), *supra*.

143.    The 2006 Allergan study[85] compared drop sizes when dispensed vertically and at 45° of bimatoprost (the generic name for Allergan's Lumigan), and Travoprost (Alcon's Travatan).  The differences between vertical and 45° were 5.1% and 19.4% for the two drugs respectively.[86]

144.    At the time of that study, the Allergan authors believed that these differences were so significant that patients should be instructed about the proper angle at which to hold the bottle.  Thus, in their published paper, the Allergan authors stated:[87]

> Health care providers are urged to instruct glaucoma patients in the most efficient method of instillation for their prostaglandin analogs.  For bimatoprost and latanoprost, the most efficient method is instillation with the bottle held vertically, with 45 degrees nearly as efficient.  For travoprost, the most efficient method is instillation at 45°.

Bimatoprost is the generic name for Allergan's brand-name Lumigan.

145.    On information and belief, Allergan no longer believes that the dispensing angle significantly affects drop size.  This allegation is based on the fact that, although in 2013 Allergan instructed consumers about obvious aspects of eye drop use, it did not then and does not now instruct consumers about the dispensing angle.  For example, Allergan maintained a web page called, "How to Use Lumigan 0.01% Drops."[88]  That page had detailed instructions and "tips," including such obvious measures as blotting away excess liquid on the skin and waiting until blurry vision clears before driving.  However, the page said nothing about the angle of the

---

[85] Fiscella (2006).

[86] The authors said they also measured drops when dispensed horizontally but did not explain how that would even be possible as the quantity of medication in the bottle decreased.  Van Santvliet and Ludwig say that "[i]n practice, the angle at which the bottle is held varies from 90° to 30°".  Van Santvliet, *Dispensing Eye Drops* (1999), *supra*, at 194.

[87] Fiscella (2006), *supra,* at 481.

[88] http://www.lumigan.com/AboutLumigan/UsingDrops.aspx (accessed December 5, 2013).

Electronically Filed - St Louis County - April 17, 2018 - 04:00 PM

Electronically Filed - St Louis County - April 17, 2018 - 04:00 PM

bottle, something Allergan would surely include if it believed it was as important and helpful as, for example, telling consumers to wipe away excess liquid and not driving with blurry vision.

### The FDA Does Not Prevent Defendants from Changing the Size of Eye Drops

146.    As the facts alleged in this Petition demonstrate, a reduction in eye drop size to 15 μL would not have a substantial potential to have an adverse effect on the identity, strength, quality, purity, or potency of the drug product as these factors may relate to the safety or effectiveness of the drug product.  Therefore, such a reduction would not be a "major change" requiring prior FDA approval pursuant to 21 C.F.R. § 314.70.  Nor does the FDA regulate the economics of drug use.  For those reasons, the FDA does not require or specifically permit Defendants to make their eye drops so large that it leads to wastage of medication.

147.    In fact, Defendants have not been constrained by any legal or regulatory restriction of the FDA from changing the sizes of their eye drops.  In fact, in some instances they have changed the sizes of their eye drops significantly and have done so without first obtaining FDA approval, according to documents posted on the FDA's website.

148.    For example, published studies from 2003 and 2008 show that Alcon's Azopt drops were substantially smaller than their earlier volume according to FDA documents.  As described above, a 1997 document on the FDA website contains data that indicate that a drop of Azopt was 50 μL, but Azopt drops were shown to be 40 μL (25.1 drops per mL) in 2003 and were reduced further to 34 μL (29.6 drops per mL) by 2008.[89]

149.    In the case of Alcon's Travatan Z, the drop size according to the FDA's review in 2005, based on what Alcon had told it, was 25 μL.  Nevertheless, just a few years later, Rylander

---

[89] Compare Fiscella (2003), *supra,* to Rylander *et al.*, *supra*.

Electronically Filed - St Louis County - April 17, 2018 - 04:00 PM

*et al.*[90] measured the size of Travatan Z drops as 30 μL, meaning that consumers and third-party payors were compelled to pay for 20% more medication than Alcon had stated to the FDA.

150.    The FDA maintains a website, called "Drugs@FDA," that can be used for "viewing the approval history of a drug."[91]  That website contains no applications for, or approvals of, the above changes in drop size of Azopt or Travatan Z.  Thus, FDA approval of those changes was apparently not required.

151.    Nor does the FDA's approval of a product's label, even where the label reflects a certain drop size, mean that the company cannot change the drop size without FDA's prior approval.  This fact is shown by the case of Xalatan, a product of pharmaceutical giant Pfizer.  The FDA's website contains the approved labels for Xalatan for the period 2001 to the present.[92]  Like the label of every other medication subject to this lawsuit, these labels do not mention the size of the drop, but they are rare examples of labels that contain data from which the size of the drop can be calculated.  Each of those labels states that the amount of the active ingredient in a drop of Xalatan was 1.5 μg and that the concentration of that ingredient in the solution was 50 μg/mL.  If accurate, that would mean that each drop was 30 μL.[93]  However, Fiscella *et al.*[94] found that Xalatan drops were 20% larger than that at 36 μL, and Rylander *et al.*[95] found that they were 34 μL.  This also means that amount of medication per Xalatan drop was up to 20% more than the 1.5 μg stated on the Xalatan labels.

---

[90] Rylander *et al*, *supra*.

[91] *See* http://www.fda.gov/Drugs/InformationOnDrugs/ucm075234.htm#purpose (accessed December 5, 2013).

[92] *See* http://www.accessdata.fda.gov/scripts/cder/drugsatfda/index.cfm?fuseaction=Search.Label_Approval-History#apphist (accessed December 5, 2013) (search for "Xalatan" to obtain the approved labels).

[93] At 1.5 μg per drop and 50 μg per mL (or 1000 μL), there are 33.3 drops per 1,000 μL (50 divided by 1.5).  Dividing 1,000 μL by 33.3 drops yields a drop size of 30 μL.

[94] Fiscella (2003), *supra*.

[95] Rylander *et al.*, *supra*.

Electronically Filed - St Louis County - April 17, 2018 - 04:00 PM

152.    Yet Xalatan's label did not change as its drop size changed, and the FDA's Drugs@FDA website shows no application for, nor FDA approval of, these changes in drop size or in the amount of medication per drop.  Thus, Pfizer was able to change the Xalatan drop size without FDA's prior approval and without changing its label.

153.    Based on Xalatan's annual retail sales of $500 million as described above, end payors in the United States paid approximately $60 million in just one year for excess medication from using 34 µL Xalatan drops compared to what they would have paid if the drops had been "only" 30 µL as suggested by the Xalatan label.

154.    Moreover, according to research presented in 2012 to the annual meeting of the Association for Research in Vision and Ophthalmology ("ARVO"), by that year Pfizer had reduced the amount of the active ingredient per drop of Xalatan to 1.13 µg, 25% less than the 1.50 µg shown on the label.[96]  If the amount of the active ingredient in a drop of Xalatan was 1.13 µg and the concentration of the active ingredient remained constant at 50 µg/mL, that means the drop size would have been only 23 µL.  On the other hand, if the drop size had stayed the same, that means that the concentration of the drug in the solution had been reduced below what was set forth on the Xalatan label.

155.    In either case, FDA regulations did not prevent Pfizer from making this change. The FDA's Drugs@FDA website, which contains applications and approvals for changes in prescription drugs, shows no application by Pfizer, nor approval by the FDA, of these changes in the amount of active ingredient per drop.  If Xalatan could, consistent with its obligations under

---

[96] Brian S, Jayat C, Desmis A, *et al.*, Pharmaceutical evaluation of the quality and delivered dose of US latanoprost generics, Abstract presented at ARVO Annual Meeting, 2012.

Electronically Filed - St Louis County - April 17, 2018 - 04:00 PM

FDA regulations, make these changes, there is no reason why it could not have reduced the size of the drops further to 15 µL consistent with its obligations under FDA regulations.

156.    Similarly, a 2011 study by scientists from the University of Toronto and University of Waterloo, Ontario, found Merck's Timoptic XE sold in the United States to be 38 µL and Falcon's generic equivalent to be 24 µL, 37% smaller.[97]  The authors explained the difference by the differing dimensions of the bottles that dispensed these two drugs.  Specifically, they pointed to the differences in the outer orifices of the dropper tips through which the fluid passes because "[t]he larger the outer orifice's diameter, the larger the cross-sectional area available for drop formation and, therefore, the larger the drop size."[98]  They stated:  "Outer orifice diameters of Canadian and American brand-name Timoptic XE bottles were approximately 3 times larger than those of the bottles of their generic equivalents; this significant difference helps to explain drop volume variability between the brand-name and the generic products."[99]

157.    In addition, manufacturers are able to change the size and dimensions of their eye drop dispensers without prior FDA approval.  For example, according to publicly available documents on the FDA website, Allergan replaced its 8 mL bottle Zymar with a 10 mL bottle and introduced entirely new container closure systems for its ophthalmic products.  It did so with a "CBE-30," meaning that it was able to make the change simply by giving FDA 30 days' notice.

## CLASS ACTION ALLEGATIONS

158.    Alcon Class.  Plaintiff Green brings this action on behalf of all persons and entities who fall within the following Class:

---

[97] Zaid N. Mammo *et al., Generic Versus Brand-Name North American Topical Glaucoma Drops*, 47 Can. J. Ophthalmology, 55 (2011).

[98] *Id.* at 58.

[99] *Id.* at 57.

Electronically Filed - St Louis County - April 17, 2018 - 04:00 PM

> All persons and entities who paid all or part of the purchase price of prescription eye drops manufactured and sold by Alcon in multi-dose dispensers and purchased within the State of Missouri within the period of the applicable statute of limitations prior to the filing of this lawsuit and up to the date of certification. ("Alcon Class.")

159.    **Allergan Class.**  Plaintiff Pitler brings this action on behalf of all persons and entities who fall the following Class:

> All persons and entities who paid all or part of the purchase price of prescription eye drops manufactured and sold by Allergan in multi-dose dispensers and purchased within the State of Missouri within the period of the applicable statute of limitations prior to the filing of this lawsuit and up to the date of certification. ("Allergan Class.")

160.    **Numerosity.**  Although the exact size of the Classes is currently unknown to Plaintiffs, the total number of Class Members in each Class is so numerous that joinder of all Class Members would be impracticable.  Accordingly, this putative class action satisfies Rule 52.08(a)(1) and Mo. Rev. Stat. § 407.025.3(1).

161.    **Commonality.**  There is a well-defined community of interest in the questions of law and fact affecting Class Members, satisfying Rule 52.08(a)(2) and Mo. Rev. Stat. § 407.025.3(2).  Among the numerous questions of law or fact common to the Classes are the following:

A.    What is the capacity of the human eye to hold dropped liquid?

B.    When an eye drop that is larger than the capacity of the eye is instilled in the eye, does the amount in excess of 15 µL have any therapeutic effect?

C.    When an eye drop that is larger than the capacity of the eye is instilled in the eye, does the amount in excess of 15 µL go to waste?

D.    Do smaller size drops, on the order of 15 µL, have an efficacy and bioavailability equivalent to larger size drops, without the waste?

E.    Does a portion of an eye drop in excess of 15 or 16 µL leave the eye through the tear duct and enter the systemic circulation without first being metabolically inactivated in the liver, leading to a risk of side effects?

Electronically Filed - St Louis County - April 17, 2018 - 04:00 PM

F.    Are drops of 15 or 16 μL preferable to larger drops, as they minimize systemic exposure, toxic side effects, and wastage?

G.    Is there any medically sound reason to dispense eye drops in excess of the capacity of the eye?

H.    Is it feasible to make an eye dropper that will dispense smaller drops than the containers of Defendant's existing ophthalmic products do?

I.    Did each Defendant engage in a scheme to increase its profits by packaging and selling its prescription eye drops in such a way that consumers were forced to buy more product than they needed?

J.    Is it unfair, within the meaning of the MMPA to sell a product that, due to the design of its dispenser, will necessarily result in wastage of the product?

K.    Did Defendants' packaging of eye drops in bottles that dispensed drops of a size that was larger than the capacity of the eye cause consumers substantial injury as a result of paying for more medication than they needed and undergoing a risk of adverse health consequences?

L.    Was the injury sustained by consumers from Defendants' packaging of eye drops in bottles that dispensed drops of a size that was larger than the capacity of the eye outweighed by countervailing benefits to consumers or to competition?

M.    Was the injury sustained by consumers from Defendants' packaging of eye drops in bottles that dispensed drops of a size that was larger than the capacity of the eye reasonably avoidable by consumers who used those products?

N.    Are the damages sustained by Class Members measured by what they paid for the portion of eye drops in excess of 16 μL?

O.    Will declaratory and injunctive relief prevent harm caused to members of the Classes going forward?

P.    Did Defendants' act with the malice necessary for the imposition of punitive damages?

Q.    Should Defendants be required to pay Plaintiffs' attorneys' fees?

162.    **Typicality.**  Pursuant to Rule 52.08(a)(3) and Mo. Rev. Stat. § 407.025.3(3), the claims of Plaintiffs are typical of the claims of the members of their respective Classes.

Electronically Filed - St Louis County - April 17, 2018 - 04:00 PM

163.    **Adequacy of Representation.**  Moreover, as required by Rule 52.08(a)(4) and Mo. Rev. Stat. § 407.025.3(4), Plaintiffs are adequate representatives of their respective Classes and have no conflict of interest with other Class Members.  Plaintiffs' counsel are experienced in this type of litigation and will prosecute the action adequately and vigorously on behalf of the Classes.

164.    **Rule 52.08(b)(2) elements.**  Certification of the Classes is proper under Rule 23(b)(2) and Mo. Rev. Stat. § 407.025.3(6), because Defendants have acted on grounds that apply generally to the Classes so that final injunctive relief or corresponding declaratory relief is appropriate respecting the Classes as a whole.

165.    **Predominance.**  Certification of the Classes is proper under Rule 23(b)(3) and Mo. Rev. Stat. § 407.025.3(7) because questions of law or fact common to each of the Classes predominate over any questions affecting only individual Class Members.  The central issue in this case is common among all Class Members:  Whether Defendants' practice of selling prescription eye drops in containers that emit drops in excess of the capacity of the eye violates the MMPA because they compel all Class Members to pay for product that will be necessarily wasted.  That question predominates over any possible questions affecting only individual Class Members.

166.    **Superiority.**  Further, certification of the Classes is similarly proper under Rule 23(b)(3) and Mo. Rev. Stat. § 407.025.3(7), since a class action is superior to other available methods for fairly and efficiently adjudicating the controversy because, among other reasons, such treatment will permit a large number of similarly situated persons and entities to prosecute their claims simultaneously and efficiently without the unnecessary duplication of evidence, effort, and expense that numerous individual cases would engender.  In addition, the class action

Electronically Filed - St Louis County - April 17, 2018 - 04:00 PM

mechanism is the only method by which Class Members with small claims could, as a practical matter, seek redress for the wrongs committed by Defendants.  The benefits of class action treatment substantially outweigh the difficulties, if any, that may arise in the management of this case as a class action.  There are no unusual difficulties that might arise in the management of this case as a class action.

167.    Certification of the Classes for purposes of pursuing injunctive relief is proper under Rule 52.08(b)(2) and Mo. Rev. Stat. § 407.025.3(6), because Defendants' conduct has affected all members of the Classes in the same manner, and, in the absence of injunctive relief, will continue to do so.  Class Members have no adequate remedy at law to redress the wrongs which are committed by Defendants on a continuing basis.

### DEFENDANTS' ACTIONS ARE UNFAIR UNDER THE FTC'S INTERPRETATION OF SECTION 5(a) OF THE FTC ACT

168.    As described more fully below, the MMPA incorporates the FTC's interpretations of § 5(a) of the FTC Act in its prohibitions.  Section 5(a) of the FTC Act declares unlawful "[u]nfair or deceptive acts or practices in or affecting commerce."

169.    Since the 1980s, the FTC has followed its Unfairness Policy Statement, which defines unfairness under the FTC Act in terms of three elements.  Under this standard, "[a]n act or practice is 'unfair' under Section 5 if it 'causes or is likely to cause [1] substantial injury to consumers [2] which is not reasonably avoidable by consumers themselves and [3] not outweighed by countervailing benefits to consumers or to competition.'"[100]

---

[100] The Structure and Practices of the Debt Buying Industry, 2013 WL 419348 (F.T.C. January 1, 2013) at *8, quoting 15 U.S.C. § 45(n) (codifying the Commission's unfairness analysis); see also Letter from the FTC to Hon. Wendell Ford and Hon. John Danforth, Committee on Commerce, Science and Transportation, United States Senate, Commission Statement of Policy on the Scope of Consumer Unfairness Jurisdiction (December 17, 1980), reprinted in the Appendix to *In the Matter of Int'l Harvester Co.*, 104 F.T.C. 949, 1079, 1074 n.3 (1984) (hereafter "FTC Unfairness Policy Statement") and also available on the FTC's website at http://www.ftc.gov/bcp/policystmt/ad-unfair.htm.  The FTC and the courts call this letter its "Unfairness Policy Statement" or "Policy Statement on

170.    As described in this Petition, the consumer injury caused by Defendants' practices of selling topical ophthalmic prescription medication in dispensers that emit excessively large drops satisfies each of the elements necessary to establish an unfair practice.

171.    First, Defendants' practices cause substantial consumer injury for two reasons. As the FTC's Unfairness Policy Statement states, "[i]n most cases a substantial injury involves monetary harm, as when sellers coerce consumers into purchasing unwanted goods or services ...."[101] That is precisely what Defendants have done by compelling consumers into purchasing unwanted amounts of prescription eye drops.

172.    Furthermore, the FTC states:  "An injury may be sufficiently substantial … if it does a small harm to a large number of people …."[102] As shown herein, the harm caused by excessively large eye drops affects millions of consumers who use prescription eye drops.

173.    In addition, the FTC Policy Statement states:  "Unwarranted health and safety risks may also support a finding of unfairness." As described herein, the large sizes of Defendants' prescription eye drops cause unwarranted health and safety risks in the following ways.

174.    First, because the drops are larger than the capacity of the eye to absorb, substantial portions pass through the lacrimal or tear duct and enter the bloodstream without first being metabolically inactivated in the liver.  As a result, patients are placed at an unwarranted risk of systemic toxic side effects, such as bronchospasm, palpitation, reduced blood pressure,

---

Unfairness."  *See id.*; *Debt Buying Industry*, 2013 WL 419348 (F.T.C.) at *8, n. 19; *Am. Fin. Servs. Ass'n v. F.T.C.*, 767 F.2d 957, 970-71 (D.C. Cir. 1985); *F.T.C. v. Cantkier*, 767 F. Supp. 2d 147, 153 (D.D.C. 2011); *F.T.C. v. Accusearch, Inc.*, 06-CV-105-D, 2007 WL 4356786 at *7 (D. Wyo. Sept. 28, 2007), *aff'd*, 570 F.3d 1187 (10th Cir. 2009); *see also Orkin Exterminating Co., Inc. v. F.T.C.*, 849 F.2d 1354, 1364 n. 10 (11th Cir. 1988) (referring to the letter as "the FTC's 'Policy Statement' on the meaning of unfair acts and practices").

[101] FTC Unfairness Policy Statement.

[102] *In the Matter of Int'l Harvester Co.*, 104 F.T.C. 949, n. 12 (1984).

Electronically Filed - St Louis County - April 17, 2018 - 04:00 PM

slowed heart rate, syncope, exercise intolerance, depression, anxiety, disorientation, confusion, headaches, fatigue, drowsiness, dry mouth, and hypertension.  The elderly are at increased risk of at least some of these effects compared to younger individuals.

175.    In addition, the excessive size of prostaglandins such as Alcon's Travatan Z and Allergan's Lumigan increases the risk of local side effects such as lengthening, thickening, and hyperpigmentation of eyelashes, darkening of the iris, and hyperpigmentation of the skin around the eye.

176.    Moreover, the size of Defendants' eye drops contributes to a situation where many patients with glaucoma run out of their medication before their insurer or other third-party payor will reimburse them for a replacement bottle.  Because these drugs are so expensive, many patients cannot afford to buy them on their own and therefore go without, placing them at increased risk of loss of vision or complete blindness.

177.    Defendants' practices also meet the second element of the FTC's Unfairness Policy Statement of not being reasonably avoidable by consumers themselves.  As described herein, there are several reasons for this.

178.    First, individual patients do not choose which drugs to take; they are prescribed their drugs by their physicians.  Once the doctor has prescribed a prescription eye drop, the patient has no reasonable alternative other than rejecting the physician's advice and foregoing the treatment entirely.

179.    Nor is there a reasonable alternative from non-pharmaceutical treatments such as surgery and lasers.  This is clearly shown in the scientific literature

180.    Alcon's John Walt stated in his chapter, *Drops, Drops and More Drops*, in the textbook Glaucoma – Current Clinical and Research Aspects (2011): "Conventional treatment

Electronically Filed - St Louis County - April 17, 2018 - 04:00 PM

usually begins with topical medications, since they are equally as effective as surgical or laser treatment, and their noninvasiveness imposes less risk.  (Musch et al., 2009) At some point, if medical options are unsuccessful at lowering IOP, surgery may be considered."[103]

181.    The textbook Clinical Ocular Pharmacology stated in its 5th edition (2008):  "The decision to use or refrain from using drugs for diagnosis or treatment is often straightforward. … Pharmacologic intervention is needed for patients who have glaucoma."[104]

182.    Moreover, consumers cannot avoid product wastage by switching to an alternative drug, because all prescription eye drops are substantially larger than 15 µL and therefore lead to wastage.

183.    In addition, it is impossible to instill less than one eye drop into one's eye.  Thus, a consumer must consume the entirety of the excessively large drop supplied by the manufacturer, even though only a portion provides any benefit.

184.    Finally, Defendants' practices meet the third and final element of the FTC's Unfairness Policy Statement in that the consumers' injuries are not outweighed by countervailing benefits to consumers or competition.  In fact, there are no countervailing benefits to consumers or competition from the excessively large eye drops that Defendants sell.

### <u>VIOLATION OF THE MMPA</u>

185.    Mo. Rev. Stat. §407.020.1 prohibits "[t]he act, use or employment by any person of any ... unfair practice ... in connection with the sale or advertisement of any merchandise in trade or commerce."

---

[103] Walt (2011), *supra,* at 198.

[104] Clinical Ocular Pharmacology, *supra,* at 3.

Electronically Filed - St Louis County - April 17, 2018 - 04:00 PM

186.    The Missouri Attorney General has promulgated regulations defining the meaning of unfair practice as used in the above statute.  Specifically, Mo. Code Regs. tit. 15, § 60-8.020, provides:

> (1) An unfair practice is any practice which-
>
> > (A) Either-
> >
> > > 1. Offends any public policy as it has been established by the Constitution, statutes or common law of this state, or by the Federal Trade Commission, or its interpretive decisions; or
> > >
> > > 2. Is unethical, oppressive or unscrupulous; and
> >
> > (B) Presents a risk of, or causes, substantial injury to consumers.
>
> (2) Proof of deception, fraud, or misrepresentation is not required to prove unfair practices as used in section 407.020.1., RSMo. (See Federal Trade Commission v. Sperry and Hutchinson Co., 405 U.S. 233, 92 S.Ct. 898, 31 L.Ed.2d 170 (1972); Marshall v. Miller, 302 N.C. 539, 276 S.E.2d 397 (N.C. 1981); see also, Restatement, Second, Contracts, sections 364 and 365).

187.    Prescription eye drops constitute merchandise as defined in the MMPA. Mo. Rev. Stat. § 407.010(4).

188.    Allergan (individually and collectively) and Alcon (individually and collectively) are persons as that term is defined in the MMPA. Mo. Rev. Stat. § 407.010(5).

189.    Defendants' sales of ophthalmic pharmaceuticals in containers designed to dispense eye drops larger than the capacity of the human eye constitute sales, as well as trade and commerce, as defined in the MMPA. Mo. Rev. Stat. § 407.010(6) and (7).

190.    For the reasons described herein, Defendants actions alleged herein violated the MMPA because they constituted unfair practices as prohibited by the MMPA and as defined in Mo. Code Regs. tit. 15, § 60-8.020.  Specifically, they (a) offend the public policy as it has been established by the Constitution, statutes or common law of Missouri, and/or by the FTC, and/or

Electronically Filed - St Louis County - April 17, 2018 - 04:00 PM

its interpretive decisions and/or (b) are unethical, oppressive and/or unscrupulous. In addition, those actions present a risk of and/or caused substantial injury to consumers.

191.    The MMPA allows "[a]ny person who purchases…merchandise primarily for personal, family or household purposes and thereby suffers an ascertainable loss of money or property, real or personal, as a result of the use or employment by another person of a method, act or practice declared unlawful by section 407.020, [to] bring a private civil action…to recover actual damages."  Mo. Rev. Stat. § 407.025.1.

192.    Plaintiffs and Class Members purchased prescription eye drops for personal, family or household purposes.  Specifically, the purpose was the medical treatment of their eye diseases and conditions.

193.    Defendants' unlawful practices caused Plaintiffs and Class Members to suffer ascertainable loss measured by the allocated purchase price for the portion of their eye drops in excess of 15 μL.

194.    Defendants' actions, as alleged herein, were performed intentionally, willfully, knowingly, and maliciously.

### COUNT I:  ALCON'S VIOLATIONS OF MMPA
(Plaintiff Christine Green)

195.    Plaintiff Christine Green re-alleges and incorporates by reference all preceding paragraphs of this Petition as though fully alleged in this paragraph.

196.    Defendant Alcon has marketed and sold prescription eye drops within the State of Missouri to consumers with the knowledge that the bottle used to apply said eye drops dispensed drops far larger than the capacity of the human eye to accept.  Despite this knowledge, the Defendant marketed and sold this product during the applicable class period and continues to do so at the present time.

Electronically Filed - St Louis County - April 17, 2018 - 04:00 PM

197.    Plaintiff Christine Green and other Alcon Class Members suffered an ascertainable loss as a result of the unlawful acts complained of herein and are therefore entitled to the relief afforded by Mo. Rev. Stat. § 407.025.

198.    This ascertainable loss resulted from the purchase by Plaintiff Christine Green and other Alcon Class Members of the prescription eye drops marketed and sold by Defendant Alcon in the State of Missouri.  This loss is a result of money paid for such pharmaceuticals that were wasted because the eye drops were larger than the capacity of the human eye.

199.    The amount of loss can be measured by the amounts they paid for that portion of topical prescription ophthalmic medication in multi-use bottles manufactured and sold by Alcon that exceeded a drop of 16 µL.  For example, if a Class Member paid for medication the drops of which were 32 µL, the amount to which they are entitled to be restored is equal to half the amount that he, she or it paid for the medication.

200.    Injunctive relief is necessary and proper to compel Alcon to cease its unfair and unconscionable acts and practices, as alleged herein.

WHEREFORE, Plaintiff Christine Green prays for the relief requested in the Prayer for Relief set forth below in this Petition.

## COUNT II:  ALLERGAN'S VIOLATIONS OF THE MMPA
(Plaintiff Jordan Pitler)

201.    Plaintiff Jordan Pitler re-alleges and incorporates by reference all preceding paragraphs of this Petition as though fully alleged in this paragraph.

202.    Defendant Allergan has marketed and sold prescription eye drops within the State of Missouri to consumers with the knowledge that the bottle used to apply said eye drops dispensed drops far larger than the capacity of the human eye to accept.  Despite this knowledge,

Electronically Filed - St Louis County - April 17, 2018 - 04:00 PM

the Defendant marketed and sold this product during the applicable class period and continues to do so at the present time.

203.    Plaintiff Jordan Pitler and other Allergan Class Members suffered an ascertainable loss as a result of the unlawful acts complained of herein and are therefore entitled to the relief afforded by Mo. Rev. Stat. § 407.025.

204.    This ascertainable loss resulted from the purchase by Plaintiff Jordan Pitler and other Allergan Class Members of the prescription eye drops marketed and sold by Defendant Allergan in the State of Missouri.  This loss is a result of money paid for such pharmaceuticals that were wasted because the eye drops were larger than the capacity of the human eye.

205.    The amount of loss can be measured by the amounts they paid for that portion of topical prescription ophthalmic medication in multi-use bottles manufactured and sold by Allergan that exceeded a drop of 16 µL.  For example, if a Class Member paid for medication the drops of which were 32 µL, the amount to which they are entitled to be restored is equal to half the amount that he, she or it paid for the medication.

206.    Injunctive relief is necessary and proper to compel Alcon to cease its unfair and unconscionable acts and practices, as alleged herein.

WHEREFORE, Plaintiff Jordan Pitler prays for the relief requested in the Prayer for Relief set forth below in this Petition.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiffs, on behalf of themselves and the Classes, pray judgment against Defendants as follows:

1.    Certifying the Classes and Subclasses as requested herein;

2.    Entering an order appointing The Law Office of Richard S. Cornfeld, The Simon Law Firm, P.C., and Brian Wolfman as lead counsel for the Classes;

Electronically Filed - St Louis County - April 17, 2018 - 04:00 PM

3.      Awarding actual damages from each Defendant in an amount to be determined;

4.      Awarding punitive damages against each Defendant as the court deems necessary or proper;

5.      Awarding declaratory and injunctive relief as permitted by law or equity including a preliminary and permanent injunction enjoining Defendants from continuing the unlawful practices as set forth herein;

6.      Awarding pre-judgment and post-judgment interest;

7.      Awarding reasonable attorneys' fees and costs herein;

8.      Awarding such other and further relief as the court deems fit and proper.

## **JURY DEMAND**

Plaintiff demands a trial by jury.

Respectfully submitted,

LAW OFFICE OF RICHARD S. CORNFELD

By:  */s/ Richard S. Cornfeld*
      Richard S. Cornfeld
      1010 Market Street, Suite 1645
      St. Louis, Missouri 63101
      (314) 241-5799
      (314) 241-5788 (fax)
      rcornfeld@cornfeldlegal.com

      and

      John G. Simon
      Kevin M. Carnie, Jr.
      THE SIMON LAW FIRM, P.C.
      800 Market Street, Suite 1700
      St. Louis, Missouri 63101
      (314) 241-2929
      (314) 241-2029 (Fax)
      jsimon@simonlawpc.com
      kcarnie@simonlawpc.com

59

Electronically Filed - St Louis County - April 17, 2018 - 04:00 PM

and

Brian Wolfman
Georgetown University Law Center
600 New Jersey Avenue, NW, Suite 312
Washington, District of Columbia 20001
(202) 661-6582
wolfmanb@georgetown.edu

***Attorneys for Plaintiffs***